# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2008

(Argued: May 26, 2009                                      Decided: February 11, 2010)

Docket No. 08-0928-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GLORIA ZABALA,

*Petitioner-Appellant*,

v.

MICHAEL J. ASTRUE, in his official capacity as COMMISSIONER OF SOCIAL SECURITY,

*Respondent-Appellee.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before:    LEVAL, POOLER, and PARKER, *Circuit Judges*.

Petitioner, whose application for Supplemental Security Income based on disability was denied by the Commissioner of Social Security based on a finding that she was not disabled, appeals from the decision of the United States District Court for the Southern District of New York (William H. Pauley III, *J.*) which rejected her petition to set aside the Commissioner's ruling.  The court of appeals (Leval, *J.*) affirms, finding that the denial of benefits was based on substantial evidence.  Although the administrative law judge improperly declined to consider a report by a treating psychiatrist, the report was substantially duplicative so that consideration of

1

the report would not have affected the disability determination.

> CARA CAMPBELL, JULIE GENDEL (Jon Romberg, *on the brief*), Seton Hall University School of Law Center for Social Justice, Newark, New Jersey, for *Appellant.*
>
> JOHN E. GURA, JR., Assistant United States Attorney (David S. Jones, Assistant United States Attorney, *on the brief*), New York, New York, for Lev L. Dassin, Acting United States Attorney for the Southern District of New York, for *Appellee.*

LEVAL, *Circuit Judge*:

Petitioner Gloria Zabala appeals from an order of the United States District Court for the Southern District of New York (William H. Pauley III, *J.*) rejecting her petition to set aside the decision of the Commissioner of Social Security denying her claim for Supplemental Security Income ("SSI") based on disability. We affirm.

## BACKGROUND

Petitioner worked as a self-employed jewelry salesperson for six or seven years until 1992. She also worked as a "marathon assistant" from October to December 1997. Beginning in April 1998, she sought treatment at the emergency room of St. Barnabas Hospital, complaining of sleeplessness, hearing voices, and nervousness. The psychiatrist who examined Petitioner reported that she was fully oriented and had an appropriate affect, but was anxious. He also reported that her insight and judgment were fair, and that no psychotic symptoms were elicited. The diagnosis was adjustment/anxiety disorder. Petitioner was referred to Fordham-Tremont

Community Mental Health Center ("FTMH").

Dr. Maria Sandos of FTMH treated Petitioner from June 1998 to January 1999. At her initial examination, Sandos observed that Petitioner was fully oriented, alert, positive, and adequately groomed. Her memory, impulse control, insight, and social judgment were fair. Sandos noted that Petitioner was preoccupied with her son's arrest, and that she complained of hallucinatory voices. Sandos's diagnosis was "major depression, moderate, dysthimia." Sandos also concluded that Petitioner's Global Assessment of Functioning ("GAF") was 65.[1] After attending therapy sessions through 1998, Petitioner reported that she felt "somewhat better" with medication, although her anxiety and depression persisted.

In September 1998, Petitioner was examined by a consulting physician, who determined that Petitioner had no physical difficulties or limitations, although she appeared anxious. In December 1998, she was examined by a consulting psychiatrist, who determined that her mood was depressed, but her judgment was fair, she possessed emotional insight, and she had no psychotic symptoms or suicidal or homicidal ideation. He diagnosed Petitioner with "[m]ajor depression, recurrent, moderate in intensity, without psychotic features." He opined that she could manage her own funds and had a fair to limited ability to understand, carry out, and

---

[1]GAF rates overall psychological functioning on a scale of 0-100 that takes into account psychological, social, and occupational functioning. A GAF in the range of 61 to 70 indicates "[s]ome mild symptoms (*e.g.*, depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV"), at 34 (4th ed. rev. 2000).

remember instructions in a work setting. Also in December 1998, a state agency physician produced a report based on Petitioner's medical record. The state physician indicated that she could lift weights up to fifty pounds and could sit, stand, or walk for periods of six hours. The state physician noted that she had deficiencies in concentration and one or two episodes of decompensation (*i.e.*, temporary increases in symptoms) in a work-like setting. He therefore opined that Petitioner had moderate limitations in activities of daily living and social functioning, marked limitations in her ability to understand, remember, and carry out complex instructions, but no limitations in understanding, remembering, and carrying out simple instructions or making simple work-related decisions.

After a session in January 1999, at which Sandos observed that her mood was less depressed and that she had no complaints of anxiety, Petitioner did not appear for her next seven scheduled appointments and FTMH closed her case file in April 1999. She returned to FTMH at the end of May 1999, and was examined by a different psychiatrist, who diagnosed her with "major depression, recurrent, moderate, without psychotic features." Petitioner had one more session, in June 1999, at which she reported feeling better on medication, and then did not return to FTMH for approximately one year.

Petitioner's return to treatment began with an emergency room visit in May 2000, where she complained of headaches and dizziness. A psychiatric consultation resulted in a diagnosis of "depressive disorder NOS [not otherwise specified]." She went to FTMH in June 2000 and was examined by Dr. Albert Scublinsky, who continued to treat her through 2002. At her intake, Dr.

Scublinsky diagnosed Petitioner with major depression with psychotic features and general anxiety disorder and determined her GAF to be 45.[2]  Eight days later, on June 20, 2000, Scublinsky saw her again and raised his assessment of her GAF to 55.[3]  After two more sessions at FTMH within the next month, Petitioner reported that she had no delusions or hallucinations, and that the medicine she was prescribed had no side effects.

In October, November, and December 2000, Petitioner reported that she was "stressed out" from having taken custody of her daughter's children, but she appeared psychiatrically stable and indicated that her medication was helpful.  In two sessions with Scublinsky, in mid-December 2000 and mid-January 2001, Petitioner reported that she suffered from sleeplessness and hearing voices.  Otherwise, from February 2001 through July 2001, she appeared psychologically stable and did not complain of hearing voices.

In July 2001, at the request of Petitioner's counsel, Dr. Scublinsky completed a questionnaire and reported a diagnosis of "major depressive [disorder], severe, recurrent, [with] psychotic [features]."  He further reported that her GAF was 55.  He noted that her primary symptoms were depression, anxiety, and auditory hallucinations, but that she also suffered from poor memory, feelings of worthlessness, social withdrawal, and decreased energy.  In a section of

---

[2]A GAF in the range of 41 to 50 indicates "[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)."  DSM-IV, at 34.

[3]A GAF in the range of 51 to 60 indicates "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)."  DSM-IV, at 34.

the questionnaire regarding Petitioner's ability to perform work-related functions, Scublinsky wrote "unable to assess."

In June 2002, Petitioner was examined by Dr. Azariah Eshkenazi in connection with her claim for benefits. Eshkanazi diagnosed a disthymic disorder and indicated that her GAF was 60. Eshkenazi also opined that she was, "at present, . . . unable to be gainfully employed." Also in June 2002, Dr. Scublinsky prepared another questionnaire, reporting the same diagnosis and GAF as he did in the July 2001 questionnaire, and again indicating that he was unable to assess Petitioner's ability to work.

Petitioner's pursuit of SSI benefits began when she filed an application on September 10, 1998. After her application was denied, she appeared with an attorney before Administrative Law Judge ("ALJ") Robin J. Arzt in September 1999, for a review of the determination. The ALJ issued an opinion finding that Petitioner was not disabled. The Social Security Appeals Council, however, reversed and remanded. During the second hearing before ALJ Artzt, in July 2003, Petitioner stated that she worked as a babysitter for "a few months" in 2001, which involved taking four children to school, picking them up, and watching them for two to three hours per day. The ALJ questioned this description of the duration of her babysitting work in light of Social Security Administration ("SSA") records indicating that she had earned $9,605 in wages in 2001. After an off-the-record discussion, Petitioner's attorney stated that the period under review would be the "closed period" from January 1, 1998 to January 3, 2001, after which, counsel acknowledged, she was "engaging in SGA [substantial gainful activity]."

In her second opinion, the ALJ again found that Petitioner was not disabled. The ALJ stated that the period under review was the closed period from August 18, 1998, the claimed onset date of her condition, to January 3, 2001, noting that Petitioner and her attorney amended the period after examining her SSA earnings records for 2001 and 2002. The ALJ then reviewed the evidence using the five-step evaluation guidelines found in 20 C.F.R. § 416.920.

At step one, the ALJ found that Petitioner had not engaged in substantial gainful activity from August 18, 1998 to January 3, 2001. At step two, the ALJ determined that her mental condition was a "severe impairment." At step three, the ALJ decided that Petitioner's condition, while severe, was not a disability *per se* under 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ found, for the period at issue, no evidence that she was limited in her ability to maintain social functioning or attend to the activities of daily living, that she was only moderately limited in her ability to maintain concentration, and that she had not displayed repeated episodes of decompensation.

At step four, the ALJ reviewed the evidence to determine whether Petitioner was disabled during the relevant period. The ALJ noted that Petitioner's first evaluations at FTMH in June 1998 indicated that she had only mild symptoms with a GAF of 65, and that by January 1999, her condition had improved with treatment. The ALJ also found that Petitioner had significant gaps in treatment in 1999 and 2000, but when she was evaluated, she was determined to be stable on medication. The ALJ described the main findings of Scublinsky's July 2001 questionnaire, noting that he diagnosed major depression with a GAF of 55, but could not assess her ability to

work. However, the ALJ discounted the June 2002 evaluation by Eshkenazi and the June 2002 questionnaire by Scublinsky. The ALJ found Eshkenazi's conclusion that Petitioner was "unable to be gainfully employed" unjustified by his diagnosis of dysthymic disorder and a GAF of 60, and he determined that the conclusion was "inappropriate" in view of her babysitting work beginning in January 2001. The ALJ refused to consider Dr. Scublinsky's June 2002 questionnaire because the ALJ believed that it was incomplete and unsigned. In fact, however, the complete, signed questionnaire was in the record.

In light of this evidence, the ALJ determined that although Petitioner's "residual functional capacity is diminished by her non-exertional limitations imposed by her depression[,] [t]here is no basis in the record to support a finding that the claimant is not able to perform the basic mental demands of unskilled work because of her mental impairment," and she would be able to return to her former unskilled work as a marathon assistant and a self-employed jewelry salesperson.

Despite concluding that Petitioner was not eligible for benefits at step four, the ALJ continued to step five, which places the burden on the Commissioner to show that the claimant has the residual functional capacity to perform other jobs. Applying the Medical-Vocational Guidelines of Appendix 2 of 20 C.F.R. Part 404, Subpart P, the ALJ determined that Petitioner was "not disabled" because she could perform unskilled work and because jobs that she could perform "exist in significant numbers in the national economy." Accordingly, the ALJ determined that she was not eligible for benefits by virtue of her August 18, 1998 application.

The Appeals Council denied Petitioner's request for review, leaving the ALJ's second opinion as the decision of the Commissioner.

Zabala filed this petition in the United States District Court for the Southern District of New York seeking review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Judge Pauley assigned the matter to Magistrate Judge Ronald L. Ellis, who submitted a report and recommendation that the Commissioner's denial of benefits be affirmed. Petitioner objected and the district court reviewed the report and recommendation *de novo*. The district court concluded that the ALJ's decision was supported by substantial evidence and granted judgment on the pleadings in favor of the Commissioner.

## DISCUSSION

In reviewing a district court's decision upholding a decision of the Commissioner, we "review the administrative record *de novo* to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971) ("[Substantial evidence is] more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (internal quotation marks omitted) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938))). Petitioner asserts various errors in the ALJ's development of the record and analysis of medical evidence. Four of these alleged errors merit discussion: the ALJ's decision to close the review period in January 2001; the ALJ's refusal to consider the 2002 Scublinsky report; the

ALJ's conclusion at step four that Petitioner could return to her former work; and the ALJ's use of the Medical-Vocational Guidelines, rather than testimony of a vocational expert, to make her determination at step five.

## I. Closing the Review Period

Petitioner first argues that it was error for the ALJ to limit the review period to the closed period from August 18, 1998 to January 3, 2001, because the ALJ had a duty to further develop the record regarding her 2001 activities. At the hearing, Petitioner testified that, beginning in 2001, she worked as a babysitter for "a few months" and that she was paid between $75 and $90 per child per week by the City. The ALJ, noting that SSA records indicated that she earned $9,600 in 2001, inquired further into this arrangement, but Petitioner did not alter her testimony. The ALJ expressed doubt that Petitioner could earn $9,600 babysitting for only a few months, and went off the record. When the hearing went back on the record, counsel requested to amend the period under review to the closed period from January 1, 1998 to January 3, 2001, conceding that Petitioner performed substantial gainful activity beginning on January 3, 2001.

Petitioner's counsel's concession and amendment of the period under review were within his authority. *See* 20 C.F.R. § 416.1510(a)(3)-(4) (a claimant's representative may "[m]ake statements about facts and law . . . [and m]ake any request or give any notice about the proceedings"). Petitioner has not pointed to any evidence that she was coerced or deceived into stipulating to the closed period. *See id.* § 416.1540(c)(1). Absent such a showing, the attorney's conduct is imputed to Petitioner. *See Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-34 (1962). In

any event, the record supports the conclusion that Petitioner was employed as a babysitter beginning in January 2001. The activities she described – picking up and dropping off children at school and watching them for several hours at home – were consistent with a babysitting job. *See* Section 301.677-010, United States Dep't of Labor, *Dictionary of Occupational Titles* (4th ed. rev. 1991), 1991 WL 672652 (G.P.O.). The amount that she earned – $9,600, an average of $800 per month – was also consistent with babysitting four hours per weekday (about eighty hours per month) at $10 per hour. In light of Petitioner's testimony and her counsel's amendment of the review period, the ALJ was not required to develop the record any more than she did. Accordingly, the ALJ did not err by limiting review to the closed period from August 18, 1998 to January 3, 2001.

**II. The 2002 Scublinsky Report**

Petitioner next argues that the ALJ's refusal to consider the June 2002 Scublinsky report, premised on the ALJ's mistake of fact regarding the report's completeness, was a violation of the so-called treating physician rule, according to which the report of a claimant's "treating" physician is entitled to a degree of deference. Scublinsky treated Petitioner, and the ALJ's consideration of his opinions was therefore subject to the rule. The ALJ was required either to give Scublinsky's opinions controlling weight or to provide good reasons for discounting them. *See* 20 C.F.R. § 404.1527(d)(2); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The reason the ALJ provided for discounting Scublinsky's June 2002 report – that the report was incomplete and unsigned – was factually incorrect. The ALJ accordingly failed to satisfy the

treating physician rule.

Such an error ordinarily requires remand to the ALJ for consideration of the improperly excluded evidence, at least where the unconsidered evidence is significantly more favorable to the claimant than the evidence considered. *See, e.g.*, *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 504-05 (2d Cir. 1998); *Johnson v. Bowen*, 817 F.2d 983, 986-87 (2d Cir. 1987). Remand is unnecessary, however, "[w]here application of the correct legal standard could lead to only one conclusion." *Schaal*, 134 F.3d at 504. "[W]here application of the correct legal principles to the record could lead [only to the same] conclusion, there is no need to require agency reconsideration." *Johnson*, 817 F.2d at 986; *see also Havas v. Bowen*, 804 F.2d 783, 786 (2d Cir. 1986) (declining to remand for consideration of a treating physician's opinion where there was no substantial evidence to refute the treating physician's conclusion that the claimant could not return to his prior employment).

In *Snell*, we remanded because the unconsidered physician reports, asserting that the claimant was totally disabled, were significantly more favorable to the claimant than the reports that were considered. *Snell*, 177 F.3d at 130, 134. Here, in contrast, the excluded evidence is essentially duplicative of evidence considered by the ALJ. The 2002 Scublinsky report is largely identical to a July 2001 report by the same doctor, which the ALJ did consider. In both reports, Dr. Scublinsky found a GAF of 55, in line with the GAF found by the other treating and consulting doctors. In both reports, Dr. Scublinsky listed the same diagnoses, which are also consistent with other reports in the record. Most significantly, Dr. Scublinsky stated in both

reports that he was "unable to assess" Petitioner's work-related functioning. *Cf. Halloran*, 362 F.3d at 32 (affirming the decision of an ALJ which discounted a treating physician report without expressly referencing the treating physician rule where the ALJ noted that the report did not include a substantive assessment whether Petitioner was able to return to previous work). Moreover, to the extent that any of the indicators in the 2002 report might be deemed to reflect a more severe condition, they are less relevant to the period under review (which ended on January 3, 2001) than the 2001 report because they refer to a more remote period.[4] The ALJ considered Dr. Scublinsky's 2001 report, and Dr. Sculbinsky's 2002 report, which the ALJ overlooked, was largely identical to it. Because the report that the ALJ overlooked was not significantly more favorable to Petitioner, we find no reasonable likelihood that her consideration of the same doctor's 2002 report would have changed the ALJ's determination that Petitioner was not disabled during the closed period. Accordingly, remand for consideration of the improperly excluded report is unnecessary.

**III. The Step Four Determination**

Petitioner further contends that the ALJ's determination that Petitioner's impairment did

---

[4]The principal difference between the two Scublinsky reports is that the later report spoke in slightly more precise terminology in describing Zabala's symptoms. Sculbinsky's 2002 report described her symptoms as including recurrent panic attacks, suicidal ideation, persistent irrational fears, and irritability, while his 2001 report said that she suffered from mood disturbance, feelings of worthlessness, and somatization. Additionally, the prognosis given in the 2001 report was "good," while the prognosis in the 2002 report is "fair." As this difference relates only to forward looking "prognoses" and not to Petitioner's condition in the relevant period, which was 18 months earlier, it is not more helpful to her case. We see no reasonable likelihood that consideration of these differences could have led to a different determination.

not prevent her from performing her previous work as a self-employed jewelry salesperson or a marathon assistant[5] was not supported by substantial evidence. The reports of Petitioner's treating psychiatrists and most of her consulting doctors during the review period indicate that she was depressive, without psychotic features other than occasional self-reported hallucination, and that her condition improved with medication. None of the clinicians who examined her indicated that she had anything more than moderate limitations in her work-related functioning, and most reported less severe limitations. Although there was some conflicting medical evidence, the ALJ's determination that Petitioner could perform her previous unskilled work was well supported. *See Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983) (noting that an ALJ need not "reconcile explicitly every conflicting shred of medical testimony").

**IV. The Step Five Determination**

Finally, Petitioner argues that the ALJ erred by failing to consult a vocational expert and relying instead on the Commissioner's Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, App. 2, in determining whether there was work in the national economy that Petitioner could perform. She asserts that her limitations were nonexertional and the Medical-Vocational Guidelines may only be used to evaluate exertional limitations.

If a claimant has nonexertional limitations that "significantly limit the range of work permitted by his exertional limitations," the ALJ is required to consult with a vocational expert. *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986) (internal quotation marks omitted) (quoting

---

[5]It does not appear that her employment as a marathon assistant was full-time work.

*Blacknall v. Heckler*, 721 F.2d 1179, 1181 (9th Cir. 1983)).  However, the "mere existence of a nonexertional impairment does not automatically . . . preclude reliance on the guidelines."  *Id.* at 603.  A nonexertional impairment "significantly limit[s]" a claimant's range of work when it causes an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity."  *Id.* at 605-06.

The ALJ found that Petitioner's mental condition did not limit her ability to perform unskilled work, including carrying out simple instructions, dealing with work changes, and responding to supervision.  Thus, her nonexertional limitations did not result in an additional loss of work capacity, and the ALJ's use of the Medical-Vocational Guidelines was permissible.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the judgment of the district court.