Selian v. Astrue

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: January 11, 2013        Decided: February 21, 2013)

Docket No. 12-871

_____

ROBERT SELIAN,

*Plaintiff-Appellant*,

—v.—

MICHAEL ASTRUE, COMMISSIONER
OF SOCIAL SECURITY,

*Defendant-Appellee.*

_____

B e f o r e:

KEARSE, KATZMANN, *Circuit Judges*, and RAKOFF, *District Judge*.[*]

_____

Appeal from a judgment of the United States District Court for the Northern District of

New York (Sharpe, *J.*), upholding the Commissioner's determination that plaintiff-appellant was

not disabled. We hold that the ALJ erred in her treatment of plaintiff's claim that he suffered

from fibromyalgia by failing to accord the proper weight to the opinion of plaintiff's treating

_____

[*] The Honorable Jed S. Rakoff, of the United States District Court for the Southern
District of New York, sitting by designation.

physician, by misconstruing the record, and by failing to evaluate the claim in light of medically accepted diagnostic criteria. We also hold that the ALJ's determination that plaintiff could perform light work was not supported by substantial evidence, and that the ALJ further erred by not determining whether plaintiff's reaching limitation was non-negligible and would therefore require the testimony of a vocational expert. Accordingly, the judgment of the district court is **VACATED** and the case is **REMANDED** to the Commissioner for further proceedings.

———————

CAROLYN A. KUBITSCHEK, Lansner & Kubitschek, New York, NY, *for Plaintiff-Appellant*.

ROBERT R. SCHRIVER, Special Assistant United States Attorney (Stephen P. Conte, Regional Chief Counsel - Region II, Office of the General Counsel, Social Security Administration, *on the brief*), New York, NY, *for* Richard S. Hartunian, United States Attorney for the Northern District of New York, Syracuse, NY, *for Defendant-Appellee*.

———————

PER CURIAM:

In this Social Security appeal, Petitioner-Appellant Robert Selian appeals from a January 23, 2012, final judgment of the United States District Court for the Northern District of New York (Sharpe, *J.*), affirming the Social Security Commissioner's denial of Selian's application for disability insurance benefits. Selian seeks disability benefits on the ground that he is unable to work because he suffers from fibromyalgia, shoulder tendinitis, and depression. On appeal, he contends that the administrative law judge ("ALJ") made several errors in reviewing the Commissioner's denial. First, he argues that the ALJ's determination that his alleged fibromyalgia was not a severe impairment was not supported by substantial evidence. Second, he argues that the ALJ erred in finding his testimony about his pain not credible. Third, he

-2-

contends that the ALJ's determination of Selian's residual functional capacity was not supported by substantial evidence, and that the ALJ incorrectly relied on the Medical-Vocational Guidelines to determine what work Selian could perform instead of obtaining the testimony of a vocational expert.

We hold that the ALJ's finding that Selian did not suffer from fibromyalgia was not supported by substantial evidence. We likewise hold that the ALJ's residual functional capacity determination that Selian could perform "light work" was not supported by substantial evidence. Finally, with respect to the ALJ's reliance on the Medical-Vocational Guidelines, we hold that the ALJ erred in failing to determine whether Selian's reaching limitation was non-negligible, which would preclude reliance on the Guidelines and require the testimony of a vocational expert.

## I.     Background

### A.     History of Physical and Mental Impairments

Selian began seeing Dr. Mark Corey on January 26, 2007, complaining of chronic pain in both shoulders, shortness of breath, and "severe" fatigue. Dr. Corey found that Selian had some tenderness in his shoulders and "weakly positive" impingement in both shoulders. Selian exhibited a good range of motion, and x-rays of his shoulders showed "no significant findings." Dr. Corey diagnosed Selian with bilateral rotator cuff tendinitis and probable epicondylitis (*i.e.*, tennis elbow), and initially treated Selian's tendinitis by injecting both of his shoulders with Lidocaine (a pain reliever) and Depo-Medrol (a corticosteroid).

Following this evaluation, Selian filed his initial application for disability insurance with the Social Security Administration ("SSA") on February 8, 2007. In this application, he claimed

that he suffered from torn rotator cuffs in both shoulders, tendinitis in both elbows, and an underactive thyroid gland. On February 21, 2007, after Selian complained of continuing pain in his right shoulder, Dr. Corey prescribed Celebrex for Selian's pain, assessed Selian as having persistent chronic rotator-cuff tendinitis, and recommended that he follow up with an orthopedist. Approximately one month later, on March 29, 2007, Dr. James Naughten gave Selian a consultative physical examination. Selian complained to Dr. Naughten about his rotator-cuff injuries and asthma. He reported that he experienced "sharp pain," made worse by lifting, but that his medication helped manage the pain. During Dr. Naughten's physical examination, he observed that Selian's stance was normal and that Selian could perform a full squat, but also that Selian walked with a stiff gait and was "unbalanced" when walking on his heels and toes. Selian did not need any assistance to walk or to change his clothes, but he had "mild difficulty" getting on and off the examination table and rising from a chair.

Dr. Naughten also administered several physical tests during this examination. The "straight-leg-raising" test was negative on both sides, and Selian displayed a full range of motion in his elbows, forearms, wrists, hips, knees, and ankles. Examining Selian's shoulders, Dr. Naughten administered several tests and found that Selian's range of motion in his shoulders was limited. Selian also had reduced sensitivity to touch and pain in both shoulders at the acromioclavicular ("AC") joints. His hand dexterity and finger dexterity were intact, but his grip strength was reduced on both sides. An x-ray of his left shoulder suggested the "possibility of rotator cuff impingement syndrome." Dr. Naughten acknowledged in his notes that Selian had a history of bilateral rotator-cuff injuries, asthma, and substance abuse. Dr. Naughten concluded that Selian would have no limitations in his ability to see, hear, talk, sit, or stand, but would have

-4-

moderate limitations in walking, climbing stairs, pushing, pulling, and reaching. He also opined that Selian could lift and carry "a mild degree of weight on an intermittent basis."

The same day that Selian saw Dr. Naughten, he also saw Dr. Dennis Noia, who performed a consultative psychological examination. Selian reported that he was experiencing difficulty sleeping, a decreased appetite, and multiple symptoms of depression, including dysphoric moods, crying spells, guilty feelings, hopelessness, and difficulties with memory and concentration. At the time of the examination, Selian was taking Cymbalta (an anti-depressant), which had improved his condition but had not eliminated his symptoms. Dr. Noia found that Selian's intellectual functioning was in the average range, and that his judgment and insight were good, but also that his recent and remote memory skills were "mildly impaired." Dr. Noia diagnosed Selian with a depressive disorder. In Dr. Noia's opinion, Selian was able to understand and follow simple and some complex tasks, both with supervision and independently. He could learn new tasks, make appropriate decisions, appropriately relate to and interact with others, maintain attention and concentration on tasks, and follow a routine.

By Selian's next appointment with Dr. Corey on May 30, 2007, Selian had developed upper back spasms. He reported that another doctor "felt that he had fibromyalgia." On physical examination, Selian displayed a reasonable range of motion in his shoulders but with "marked muscular tenderness posteriorly" and "tender points in various locations." Dr. Corey assessed "[f]ibromyalgia-type pain," which he determined was also associated with Selian's sleeping and mood problems. He prescribed Selian Elavil (an antidepressant), and encouraged Selian to follow up with a psychiatrist.

A few weeks later, on April 17, 2007, a State-agency psychologist, Dr. E. Kamin, conducted a psychiatric assessment of Selian. Dr. Kamin indicated that Selian had mild limitations in his daily activities, that he had mild difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence or pace. In terms of Selian's mental functional capacity, Dr. Kamin concluded that Selian was moderately limited in his ability to understand and remember detailed instructions, but that he could remember short and simple instructions or work locations and procedures. Selian appeared moderately limited in his ability to respond appropriately to changes in his work setting. Dr. Kamin ultimately concluded that Selian's allegations of psychiatric symptoms were "partially credible but not to the extent that he alleges," and that he was able to perform simple tasks.

On June 20, 2007, Selian saw Deena J. Schwartz, a nurse practitioner, for chronic pain and dysphoric mood. Selian told Nurse Schwartz that he had difficulty falling asleep at night and would wake up three hours later, and that he was napping during the daytime. He said that he thought he had fibromyalgia, and "possibly [c]hronic [f]atigue [s]yndrome." Nurse Schwartz noted that her examination with respect to Selian's mental status was "essentially unremarkable." She also indicated that Selian's mood was initially stable and cooperative but later degenerated; he became irritable and impatient, and his affect became arrogant and sarcastic. Schwartz indicated that she thought Selian had a "[r]eactive and irritable mood but no clear [b]ipolar symptoms or" other psychiatric diagnosis. She recommended that Selian continue therapy.

Selian returned to Dr. Corey on June 25, 2007, for a follow up, and reported that he had seen a mental-health counselor. In his words, his sleep difficulties had improved "90%" and his

back pain was "pretty much resolved," although he continued to feel pain in his shoulders. His affect was "reasonably appropriate." He no longer had much posterior muscle tenderness. Dr. Corey assessed depression with some improvement and chronic pain syndrome with mild improvement, and increased Selian's Elavil dosage.

On September 4, 2007, Selian returned to Corey and reported improvement in his pain from a "10 out of 10" on the pain scale to a "5 out of 10." He also stated, however, that he was having problems with his memory, as well as grogginess, trouble sleeping, and an increased appetite and weight gain. Dr. Corey determined that Selian was exhibiting fibromyalgia — which "apparently improved with Elavil" — excessive fatigue due to sleep disturbances and sleep apnea, cognitive difficulties related to depression, and hypothyroidism, the last of which was unlikely to cause his symptoms.[1]

Selian began mental therapy in September 2007, according to Nurse Schwartz's treatment notes, and he spent "much of his time offering [reasons] why he needs disability" benefits. Selian complained of chronic daily pain and said that he could not "move, walk or sit," and that the Elavil "sort of work[ed]." His mood was neutral and he had a full range of affect. Schwartz stated that she thought Selian suffered from an adjustment disorder due to chronic pain, and also noted that Selian was recovering from cocaine addiction. She found "inconsistencies in [Selian's] reported history and behavior" and suspected he was malingering to obtain disability benefits. She prescribed him Prozac on a trial basis.

---

[1] At this time, Selian also updated his application for disability benefits to include fibromyalgia.

Selian saw Schwartz again on December 3, 2007, and reported that he had run out of medication. Schwartz explained to Selian that this was inconsistent with his medical history; his last prescription had been refilled less than three weeks earlier, with three refills. Selian complained that he had been in "so much pain" recently, and he became agitated when Schwartz addressed his medication. Schwartz restarted him on Prozac and wrote another prescription for it.

On July 23, 2008, Virginia Bronson, a licensed social worker, completed a questionnaire regarding Selian's mental condition. She indicated that Selian had "moderate" limitations in the areas of maintaining attention and concentration for extended periods of time, performing activities within a schedule, maintaining regular attendance and punctuality, completing a normal work day and work week without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number of rest periods. She indicated that Selian had "marked" limitations in his ability to carry out an ordinary routine without special supervision; interact appropriately with the public; accept instruction and respond to criticism appropriately; get along with coworkers; and appropriately respond to ordinary stressors and changes in the work setting. Bronson also indicated that Selian's mental condition would cause him to have more than three absences from work per month.

Dr. Corey completed a questionnaire for Selian on July 24, 2008. He indicated a diagnosis of fibromyalgia and possible rotator-cuff tendinitis, noting that Selian's "condition is largely subjective in nature." Corey opined that Selian would need to take rest breaks of more than one 10 minutes rest period per hour while working. He also stated that Selian could not sit for six or more hours a day and could stand for at least two hours in an eight-hour workday. He

explained that Selian's medication would affect his concentration and ability to sustain a work pace "at least moderately."

Based on a referral from Dr. Corey, Dr. Paul Dura, a rheumatologist, undertook a consultative examination of Selian on May 18, 2009. Selian reported a history of fibromyalgia and depression to Dr. Dura and described a variety of pains in his body, as well as fatigue. Selian told Dr. Dura that he was unable to walk from his house to the mailbox and back and that he walked with a stiff gait. On physical examination, Dr. Dura found that Selian appeared healthy, and that he was able to get on and off the examination table and a stool without difficulty. Selian exhibited a good range of motion. Dr. Dura found no swelling in Selina's shoulders, but also observed that moving Selian's shoulders caused him some discomfort. Dura noted "numerous soft tissue tender points," and reported to Dr. Corey that Selian "appear[ed] to have fibromyalgia syndrome" and "perhaps early degenerative arthritis."

*B. Work History*

From 1980 until 2000, Selian held a series of physically taxing unskilled jobs. His last full-time job was as a delivery driver at Grieves Darien Pharmacy, which job required him to lift at least 75 pounds. Selian stopped working as a driver because he was physically unable to continue to do the job. In an effort to find jobs that did not require him to lift significant amounts of weight, he held various part-time, unskilled jobs from 2001 through 2006. Selian held only a GED and had not had employment other than in manual labor jobs that required him to lift significant amounts of weight. For example, as a road painter, he had to lift a spray painter that weighed 100 pounds onto a truck; as an employee at a gardener's center, he had to carry heavy bags of mulch.

By the time Selian started a job as a gas station attendant in early 2006, he could no longer lift the hoods of cars or squeeze the handles of the gas pumps. He quit after two months, in May 2006. His last job was at the Oswego Penny Saver newspaper company, which he held from November to December 2006, where he stacked, packed, and stored bundles of papers. He quit on December 21, 2006, because his shoulder pain was too intense to continue. He has not held employment since.

C.      *Hearing Before and Decision of the Administrative Law Judge and Appeal to the District Court*

After Selian filed for benefits, the Commissioner denied his application at the initial review stage on April 20, 2007. Selian requested an administrative hearing, which was held before the ALJ on April 29, 2009. At that hearing, Selian testified that he had not worked since December 2006 because of the pain in his shoulders. Selian further testified that, at the time of the hearing, he had torn both rotator cuffs, degenerative arthritis in his shoulders, tendonitis in both elbows, "fibromyalgia in [his] back," pain in his hip, wrist, and knee, fatigue, and depression. He stated that he had difficulty following conversations, lost his train of thought, and could not watch television because it left him dizzy and confused. He testified that he napped during the day and had difficulty sleeping at night. On a scale of one to ten, Selian rated his shoulder pain and fibromyalgia as an "between an eight and a nine."

According to Selian, he could not dress himself, wash his hair, shave, or put his shoes on. He used a seat in his bathtub to wash himself and had a safety bar installed in the tub. Because of his depression, he did not socialize with others, sometimes neglected his personal hygiene, and could not handle stress.

In terms of physical capabilities, Selian testified that he sat "most of the day" but needed to alternate between sitting and standing because of hip pain. He said that he could not stand for more than ten minutes, and could only walk to the mailbox and back with difficulty. He could not reach overhead with either arm, and he was unable to carry any amount of weight.

After considering the record, the ALJ denied Selian's application for benefits. Following the Social Security Commission's five-step analysis, *see infra*, the ALJ first found that Selian had not engaged in substantial gainful activity since his alleged onset date of June 30, 2001. The ALJ next found that, for the period before January 26, 2007 (when Selian first saw Dr. Corey), Selian had not provided any evidence of a medically determinable impairment. For the period beginning January 26, 2007, however, the ALJ concluded that the evidence showed that Selian had two severe impairments: degenerative joint disease of the shoulders and a mood disorder. Despite Dr. Corey's diagnosis, the ALJ rejected Selian's contention that he had fibromyalgia, finding that the medical evidence did not show he had fibromyalgia. The ALJ then concluded that these impairments did not meet or equal any per se impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

Accordingly, because Selian's disorders were not per se impairments, the ALJ next determined Selian's residual functional capacity ("RFC"). She found that he could lift and carry up to 20 pounds occasionally and 10 pounds frequently, and that, during an eight-hour workday, Selian had no limitations on standing or sitting and could walk for a total of two hours. The ALJ further found that Selian could only occasionally push, pull, and reach in all directions. With respect to Selian's mental limitations, the ALJ found that Selian could understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual work

-11-

situations; and deal with changes in his routine work setting. The ALJ therefore concluded that Selian could perform "light work" as defined in the Social Security regulations. *See* 20 C.F.R. § 404.1567(b).

Given Selian's RFC of "light work," the ALJ found that he could not perform any of his past relevant work. The ALJ thus determined whether Selian's RFC and his work history showed that Selian could perform other jobs existing in significant numbers in the national economy. Applying the Medical-Vocational Guidelines set forth at 20 C.F.R. Part 4, Subpart P, Appendix 2 (the "Grids"), the ALJ found Selian not disabled and denied his claim. This decision became the final decision of the Commissioner on October 27, 2010, when the Appeals Council denied Selian's request for review.

On November 19, 2010, Selian commenced the instant action in the district court, challenging the Commissioner's denial of his application for benefits. Specifically, Selian contested the ALJ's assessment of the medical records and opinions, the ALJ's finding of Selian's RFC, and the ALJ's assessment of specific findings by Selian's treating physicians. On January 23, 2012, the district court issued a Memorandum-Decision and Order affirming the ALJ's denial of benefits. The district court found that the ALJ had properly evaluated the opinions of Drs. Naughten, Corey, and Noia, and that the ALJ's findings regarding the mental portion of Selian's RFC had been made properly and were supported by substantial evidence. *Selian v. Astrue*, No. 3:10 cv 01400 GLS, 2012 WL 177957, at \*1-3 (N.D.N.Y. Jan. 23, 2012). The district court concluded that substantial evidence supported the Commissioner's decision that Selian was not disabled and denied Selian's appeal. The Clerk of the Court entered final

judgment in favor of the Commissioner on January 23, 2012, and Selian timely filed his notice of appeal on February 15, 2012.

## II.    Discussion

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks omitted); *see also* 42 U.S.C. § 405(g).  "[S]ubstantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted).  In determining whether the agency's findings were supported by substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam).  We conduct a plenary review of the administrative record, and our focus is on the administrative ruling more than on the district court's decision. *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).  If there is substantial evidence to support the determination, it must be upheld.  *Id.*; *see also* 42 U.S.C. § 405(g).

To be found eligible for disability insurance benefits, an applicant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d).  In evaluating disability claims, the SSA follows a five-step process mandated by the relevant regulations:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the

claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [*per se* ] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera*, 697 F.3d at 151 (alterations in original) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998); *see* 20 C.F.R. § 404.1520. The Social Security regulations define residual functional capacity as the most the claimant can still do in a work setting despite the limitations imposed by his impairments. *Id.* § 404.1545. In assessing the residual functional capacity of a claimant with multiple impairments, the SSA considers all his "medically determinable impairments . . . , including . . . medically determinable impairments that are not 'severe.'" *Id.* § 404.1545(a)(2). The claimant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last. *See* Clarification of Rules Involving Residual Functional Capacity Assessments, 68 Fed. Reg. 51,153, 51,154–55 (Aug. 26, 2003) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 2006).[2]

Selian first argues that the ALJ erred in concluding that Selian's fibromyalgia was not a medically determinable impairment. Specifically, Selian contends that the ALJ improperly disregarded the diagnosis of Selian's treating physician, Dr. Mark Corey; improperly substituted her own medical judgments; and confused and misstated the medical evidence. We agree.

---

[2] This burden shift is "limited," and "the Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam) (citing 20 C.F.R. § 404.1560(c)(2)).

The record indicates that Dr. Corey diagnosed Selian with fibromyalgia. The opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008); *Green-Younger v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding ALJ erred in not giving treating physician's diagnosis of fibromyalgia controlling weight); 20 C.F.R. § 404.1527(c)(2) (noting that treating physicians offer a "unique perspective to the medical evidence" that cannot otherwise be obtained from the record). In order to override the opinion of the treating physician, we have held that the ALJ must explicitly consider, *inter alia*: (1) the frequently, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist. *Burgess*, 537 F.3d at 129.

The ALJ erred in its treatment of Dr. Corey's opinion in several respects. First, she misconstrued the record. For example, she quoted a portion of Dr. Corey's medical notes where he wrote that Selian's "response to prednisone was not suggestive of fibromyalgia" as evidence that Selian did not suffer from the disorder. But this ignored the context of the notation. Dr. Corey's full notes stated that Selian's "response to prednisone is curious and not suggestive of fibromyalgia *although [he] clinically appears to have [it]* — advised strongly to see rheumatology." Admin. R. 371 (emphasis added). The ALJ made no effort to reconcile this apparent inconsistency. Similarly, the ALJ concluded that Dr. Corey's diagnosis of "fibromyalgia" differed from Dr. Dura's diagnosis of "fibromyalgia syndrome," without explaining why she concluded that the diagnoses were different. This failure was especially

problematic considering that Dr. Dura's letter appears to concur with Dr. Corey's diagnosis. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (holding ALJ may not "arbitrarily substitute [her] own judgment for competent medical opinion" (internal quotation marks omitted)); *see also Valet v. Astrue*, No. 10-CV-3282 (KAM), 2012 WL 194970 (E.D.N.Y. Jan. 23, 2012) (using the terms "fibromyalgia" and "fibromyalgia syndrome" interchangeably).

Moreover, instead of addressing Dr. Corey's diagnosis on its merits in accord with *Burgess*, the ALJ credited the findings of Dr. Naughten over Dr. Corey's views, even though Dr. Naughten performed only one consultative examination (and this examination occurred before Dr. Corey suspected that Selian might have been suffering from fibromyalgia). We have previously cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination. *See Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990). Again, the ALJ made no effort to reconcile the contradiction or grapple with Dr. Corey's diagnosis. The failure to provide "good reasons" for not crediting Dr. Corey's diagnosis by itself warrants remand. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *see* 20 C.F.R. § 404.1527(c)(2).

Additionally, the ALJ improperly substituted her own criteria as to what is necessary to establish a fibromyalgia diagnosis without support from medical testimony. She concluded that "[n]one of the other symptoms associated with fibromyalgia (such as non-restorative sleep, gastrointestinal issues, etc.) have been documented so as to warrant a diagnosis consistent with accepted medical practice . . . ." Admin R. 13. This conclusion overlooked the facts in the record and, more egregiously, constituted an improper substitution by the ALJ of her own lay opinion in place of medical testimony. *See Burgess*, 537 F.3d at 131. First, Selian's doctors noted repeatedly that he was having trouble sleeping. But the ALJ did not reference any of this

-16-

record evidence in reaching her conclusion that Selian had not sufficiently documented non-restorative sleep problems.

Second, there is no medical evidence in the record that supports the ALJ's opinion that non-restorative sleep and gastrointestinal issues are *necessary* to support a diagnosis of fibromyalgia. Relying on guidance from the American College of Rheumatology ("ACR"), we have focused on whether a patient exhibits "tender points" in evaluating claims of fibromyalgia. *Green-Younger*, 335 F.3d at 101, 107 & n.14 (noting that treating physician observed "multiple tender points" and criticizing ALJ for failing to mention the presence of tender points, "the primary diagnostic technique for fibromyalgia"). The SSA has done so as well. After the termination of Selian's proceedings before the ALJ, the SSA issued a regulation on fibromyalgia that, *inter alia*, directs ALJs to evaluate a purported fibromyalgia diagnosis on the basis of the tender points criteria. *See* SSR 12-2P, 2012 WL 3104869, at *3 (July 25, 2012).[3] Here, both Dr. Corey and Dr. Dura observed tender points before concluding that Selian appeared to have fibromyalgia. Because the ALJ failed to address the grounds for the diagnosis presented, her finding that Selian did not suffer from fibromyalgia is not supported by substantial evidence.

Selian requests that we remand to the Commissioner with directions to award Selian benefits. We decline to do so because Selian has not shown that he is entitled to benefits based

[3] This Social Security Ruling also sets forth an additional path that a claimant can rely on to support a diagnosis of fibromyalgia, which is based on the ACR's 2010 Preliminary Diagnostic Criteria. SSR 12-2P, 2012 WL 3104869, at *3. Under the 2010 Criteria, instead of relying on tender points, a claimant may also show that he has "[r]epeated manifestations of six or more [fibromyalgia] symptoms . . . , especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome." *Id.* (footnotes omitted). But this path does not supersede establishing a diagnosis based on the "tender points" criteria. *See id.* at *2-3 (noting the ruling "provide[s] two sets of criteria for diagnosing [fibromyalgia]," either of which is sufficient to establish the impairment).

-17-

on the record below.  *See Williams v. Apfel*, 204 F.3d 48, 50 (2d Cir. 2000) (holding award of benefits is appropriate only where the record "provide[s] persuasive evidence of total disability that [would render] any further proceedings pointless").  The ACR diagnostic criteria for fibromyalgia require finding "focal" tender points or that a patient exhibits 11 out of 18 normal tender points, but no such specific examination appears in the record.  The diagnoses of both Dr. Corey and Dr. Dura appear tentative.  Dr. Naughten noted that Selian's joints (if not his whole body) were "nontender."  And one of Selian's treating medical professionals, Nurse Schwartz, although indicating that Selian had "chronic pain," also suspected him of malingering.[4]  We therefore express no opinion on the ultimate merit of Selian's claim for benefits.

On remand, we direct the Commissioner to determine the proper weight to give to Dr. Corey's opinion.  To the extent that record is unclear, the Commissioner has an affirmative duty to "fill any clear gaps in the administrative record" before rejecting a treating physician's diagnosis.  *Burgess*, 537 F.3d at 129 (internal quotation marks omitted). In following the SSA fibromyalgia guidelines that are now "binding upon SSA's corps of ALJs," *Vega v. Harris*, 636 F.2d 900, 903 (2d Cir. 1981); *see also* 20 C.F.R. § 402.35(b)(1), the ALJ must rely on the medical criteria that the treating physician found to support a diagnosis of fibromyalgia — here, tender points — and may not substitute her own opinion as to the proper diagnostic criteria.

Selian next contends that the ALJ erred in finding his testimony about his pain not credible.  Selian did not, however, present this argument to the district court and has therefore forfeited it on his appeal.  *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).  Although Selian asks us to excuse this forfeiture to avoid manifest injustice, *see Sniado v. Bank*

---

[4] The ALJ did not attempt to reconcile this inconsistency either.

*Austria AG*, 378 F.3d 210, 213 (2d Cir. 2004) (per curiam), we find no such manifest injustice here. The ALJ set forth specific reasons for why she found his testimony not credible and an ALJ's credibility determination is generally entitled to deference on appeal. *Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009) (summary order) (citing *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). Accordingly, we decline to reach the issue.

Turning to the ALJ's consideration of whether Selian could perform other work, Selian argues that the ALJ committed two errors in evaluating this fifth factor in the disability adjudication process. First, he contends that the ALJ's determination of Selian's RFC was not supported by substantial evidence. Second, he asserts that his non-exertional impairments should have precluded the ALJ from relying on the Medical-Vocational Guidelines (the "Grids"), and that the ALJ should have instead sought testimony from a vocational expert. We agree on both counts.

With respect to Selian's RFC, the ALJ concluded that Selian was able to perform "light work," which requires the ability to lift 20 pounds occasionally and 10 pounds frequently. 20 C.F.R. § 404.1567(b). The ALJ stated that she based this conclusion on the reports of Dr. Naughten and Dr. Noia. Dr. Noia, a psychiatrist, did not discuss Selian's ability to lift. Dr. Naughten opined that Selian "should be able to lift . . . objects of a mild degree of weight on an intermittent basis."

Dr. Naughten's opinion is remarkably vague. What Dr. Naughten means by "mild degree" and "intermittent" is left to the ALJ's sheer speculation. *See Carrube v. Astrue,* No. 3:08-CV-0830 (FJS), 2009 WL 6527504, at *8 (N.D.N.Y. Dec. 2, 2009) (reversing denial of benefits where Dr. Naughten offered identical opinion on claimant's ability to lift weight, noting

that court "cannot fathom what might support the ALJ's conclusion that Plaintiff could lift and carry twenty-five to fifty pounds"), *report and recommendation adopted by*, 2010 WL 2178499 (N.D.N.Y. May 28, 2010).  By contrast, Selian testified that he could not carry even a gallon of milk.  Dr. Naugthen's opinion does not provide substantial evidence to support the ALJ's finding that Selian could lift 20 pounds occasionally and 10 pounds frequently.  *See Curry v. Apfel*, 209 F.3d 117, 123-24 (2d Cir. 2000), *superseded by statute on other grounds, as recognized in Douglass v. Astrue*, No. 11-3325-cv, 2012 WL 4094881, at *1 (2d Cir. Sept. 19, 2012) (summary order).  At a minimum, the ALJ likely should have contacted Dr. Naughten and sought clarification of his report.  20 C.F.R. § 404.1520b(c)(1).

Finally, Selian argues that the ALJ erred in relying solely on the Grids to determine whether Selian could work in another vocation.  The Grids are inapplicable in cases where the claimant exhibits a significant non-exertional impairment (*i.e.*, an impairment not related to strength).  *Rosa v. Callahan*, 168 F.3d 72, 82 (2d Cir. 1999); 20 C.F.R § 404.1569a(c)(2).  Although the Commissioner contends that Selian forfeited this argument by failing to raise it before the district court, Selian argued below that the ALJ erred in its consideration of his non-exertional impairments.  This is sufficient to preserve the argument on appeal.

We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a "negligible" impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert.  *See Zabala v. Astrue*, 595 F.3d 402, 411 (2d Cir. 2010); *see also Saiz v. Barnhart*, 392 F.3d 397, 400 (10th Cir. 2004) (per curiam).  A nonexertional impairment is non-negligible "when it . . . so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity."  *Zabala*,

595 F.3d at 411 (internal quotations marks omitted). Selian contends that he suffers from three non-exertional impairments: pain, a severe restriction on reaching due to shoulder problems, and clinical depression.

With respect to pain, the ALJ declined to find Selian's testimony about his pain credible. *See supra*. Thus, we find no error in the ALJ's conclusion that pain did not deprive Selian of a meaningful employment opportunity. We likewise find no error in the ALJ's conclusion that depression did not require the testimony of a vocational expert. Although the ALJ noted that Selian suffered from a mental illness, she concluded that the evidence established that Selian could perform the "basic mental demands of unskilled work," such as following simple instructions, and responding appropriately to supervisors and coworkers in usual work situations, *see Zabala*, 595 F.3d at 411 ("The ALJ found that Petitioner's mental condition did not limit her ability to perform unskilled work, including carrying out simple instructions, dealing with work changes, and responding to supervision. Thus, her nonexertional limitations did not result in an additional loss of work capacity, and the ALJ's use of the Medical–Vocational Guidelines was permissible.").

Turning to the reaching limitation, however, the ALJ did not affirmatively determine whether or not Selian's reaching limitation was negligible, despite finding that Selian could reach only "occasionally." "Occasionally" is defined in the Medical-Vocational Rules as anywhere from "very little up to one-third of the time." SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983). Where on this spectrum Selian falls is unclear from the record. Reaching is "required in almost all jobs," and a reaching limitation "may eliminate a large number of occupations a person could otherwise do." SSR 85-15, 1985 WL 56857, at *7 (Jan. 1, 1985). We note that Selian testified that he could not reach above his head at all. Admin. R. 43.

As the Tenth Circuit explained in *Saiz*, whether a reaching limitation affects a specific claimant's ability to find work "is not a [mere] technical or formalistic point." 392 F.3d at 400. Accordingly, the ALJ erred by not determining whether this reaching limitation precluded reliance on the Grids. *See id.* On remand, the Commissioner should assess whether Selian's reaching limitation is negligible. If this limitation reduces Selian's ability to find meaningful employment, the Commissioner should obtain testimony from a vocational expert to determine whether, given a non-negligible reaching impairment, Selian is nonetheless able to perform other jobs existing in the national economy.

## III.    Conclusion

Accordingly, for the foregoing reasons, the judgment of the district court is **VACATED** and the case is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.