Christopher SALDIN, Plaintiff,

v.

Carolyn W. COLVIN, Acting
Commissioner of Social
Security, Defendant.

No. CV–13–4634 (ADS).

United States District Court,
E.D. New York.

Signed Aug. 4, 2014.

Law Offices of Harry J. Binder and Charles E. Binder, P.C., by: Charles E. Binder, Esq., of Counsel, New York, NY, for the Plaintiff.

The United States Attorney, Eastern District of New York, by: Vincent Lipari, Assistant United States Attorney, of Counsel, Brooklyn, NY, for the Defendant.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

On August 16, 2013, the Plaintiff Christopher Saldin filed this appeal of a decision dated August 25, 2011 pursuant to Section 205(g) of the Social Security Act (the "SSA"), as amended, 42 U.S.C. § 405(g). That decision denied the Plaintiff's application for Social Security Disability ("SSD") Benefits under sections 216(i) and 223(d) of the SSA. On June 19, 2014, the parties moved pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 12(c) for judgment on the pleadings. For the following reasons, the Court denies the Defendant Acting Commissioner of Social Security's motion and grants the Plaintiff's motion to reverse the August 25, 2011 decision of the Defendant Acting Commissioner of Social Security and remand for a new hearing and decision.

### I. Procedural History

On July 14, 2010, *pro se* Plaintiff Christopher Saldin filed an application for SSD Benefits. Transcript ("Tr.") 67, 112–13. The Plaintiff alleges disability since September 1, 2008. *Id.* On November 17, 2010, the Plaintiff's application was denied. Tr. 79–82. On December 13, 2010, the Plaintiff requested an administrative hearing. Tr. 83–84.

On August 16, 2011, the Plaintiff appeared *pro se* at an administrative hearing before Administrative Law Judge ("ALJ") Bruce MacDougall. Tr. 47–66. A hearing was held.

In a decision dated August 25, 2011, ALJ MacDougall found the Plaintiff not disabled. Tr. 32–43. The Plaintiff requested a review of the ALJ decision. Tr. 30. On June 19, 2013, the Appeals Council denied the Plaintiff's request for review. Tr. 5–12. This appeal followed. On June 19, 2014, both parties moved under Fed. R.Civ.P. 12(c) for judgment on the pleadings.

### II. Factual History

#### A. The Plaintiff's Background

The Plaintiff was born in 1975 and was 32 years old at the onset of his alleged disability. *See* Tr. 112. The Plaintiff completed a few years of college but did not receive a degree. Tr. 60. In the past fifteen years, the Plaintiff has been employed as a cashier, usher, retail salesperson, stocker, foundry worker, barista, coffee bean packer, dishwasher, delivery person, and dog walker. Tr. 51–56; *see also* Tr. 146, 152–57, 173–80. The Plaintiff states that he last worked full-time in 2008 and has since been disabled by depression, anxiety, irritable bowel syndrome ("IBS"), scoliosis, and insomnia. Tr. 145. From March 2010 through the date of the ALJ hearing, the Plaintiff worked four hours a week as a respite care worker. Tr. 53, 157.

#### B. The Non–Testimonial Evidence Presented in the Support of Plaintiff's Initial SSD Claim

In a report dated September 10, 2010, the Plaintiff indicated that he lived with

his parents. Tr. 163. The Plaintiff prepared simple meals daily, cleaned, did laundry, but rarely did yard work. Tr. 165–66. The Plaintiff walked, rode in a car, used public transportation, and had a driver's license. However the Plaintiff did not drive at the time because he did not have a car and had previously been involved in car accidents. Tr. 166. The Plaintiff stated that he was able to go out alone and did so daily. *Id.* However, the Plaintiff indicated that shopping made him angry, so he did it as quickly as possible and shopped for clothes only when needed. *Id.* The Plaintiff was able to handle money. Tr. 166–67.

The Plaintiff tried to watch movies, read books, and listen to music. Tr. 167. The Plaintiff stated that since the onset of his illness, he has less ability to focus and concentrate on these activities. *Id.* The Plaintiff visited the library weekly. *Id.*

The Plaintiff stated that he had problems speaking with people he did not know. *Id.* He lacked communication with his family and would sometimes "scare" his friends with his depression and anger. *Id.* The Plaintiff believed he had lost friends. Tr. 168. The Plaintiff was not likely to go out. *Id.* He found it difficult to motivate himself to do anything, but he spent some time with others. Tr. 167. The Plaintiff sent e-mails, visited friends, and talked on the phone, although anxiety and lack of energy made it difficult for him to call people. *Id.*

The Plaintiff's condition affected his ability to read, be patient with people, control his anger, "deal with friends," and sleep. Tr. 164. The Plaintiff had problems paying attention, remembering things, and completing tasks, but he was able to follow spoken and written instructions. Tr. 169–70. The Plaintiff had negative reactions to authority and would "zone out, do the opposite out of spite, or become agitated when told what to do," depending on the person and his or her approach. Tr. 169. At most jobs, he had been spoken to about his attitude. Tr. 170. The Plaintiff contended that he had been dismissed from jobs or forced to quit because of "anger related anxiety." Tr. 151. For example, he was fired from Whole Foods because he yelled at an co-employee that had yelled at him. Tr. 170. Stress or changes in schedule caused him anxiety, anger, and depression. *Id.*

The Plaintiff reported that he was on clonazepam for anxiety, Dicyclomine for IBS, Fluoxetine for depression, and Trazodone for insomnia. Tr. 148.

## C. The Evidence Presented in Support of the Plaintiff's Appeal to the ALJ

In a report completed by the Plaintiff in connection with his appeal of the SSA's initial decision denying the Plaintiff's application for Social Security disability benefits, he reiterated that anxiety affected his ability to interact with others, drive, read, and write. Tr. 187. Also, the Plaintiff's anxiety affected his "ability to get up, search for work, leave the house, [and] make phone calls." *Id.* He was taking clonazepam for anxiety, Concerta for attention deficit hyperactivity disorder ("ADHD"), Nexium for gastritis, and methocarbamol for muscle pain in his lower back, neck, and shoulders. Tr. 186.

### 1. The Testimonial Evidence from the Plaintiff

During the August 16, 2011 administrative hearing, the Plaintiff testified that he lived with his parents. Tr. 58. The Plaintiff did not perform household chores, although he offered to do so. Tr. 59. In his free time, the Plaintiff watched movies, used the computer, and tried to read. *Id.* The Plaintiff did not interact with many people and was very distant from most of

his friends. *Id.* He had used marijuana four to five months prior to the hearing. Tr. 60–61. The Plaintiff hardly slept and felt like he had not rested in years. Tr. 63.

The Plaintiff had never been hospitalized for his conditions. Tr. 61. The Plaintiff had IBS for at least fifteen years. Tr. 64. Some days, the pain from IBS made it difficult for the Plaintiff to move. *Id.* The Plaintiff had been receiving outpatient therapy since 2008. Tr. 61. At the time of the hearing, the Plaintiff had weekly therapy appointments and monthly psychiatrist appointments. Tr. 61–62. Attending the appointments was stressful for the Plaintiff, but talking to a therapist enabled him to relax. Tr. 62. The Plaintiff stated that the therapy was sometimes helpful but he did not believe that the medications helped him. *Id.*

In August 2009, the Plaintiff was laid off from a retail sales job without being given a specific reason. Tr. 54–55. He received unemployment for ninety-nine weeks. Tr. 55. He later worked as a dog walker for about one month, earning between $40–$200 per week. Tr. 56. He stopped walking dogs because it was stressful and he did not have his own car. Tr. 62–63. At the time of the hearing, the Plaintiff worked as a respite care worker for his friend's autistic son. Tr. 53. The Plaintiff would stay with the child for four hours at a time. *Id.* The work was not regular and ranged from a few times a month to every few months. Tr. 54.

The Plaintiff stated that severe anxiety prevented him from working. Tr. 57. The anxiety caused the Plaintiff to act out in anger towards customers and other employees. He was not violent, but he was rude and nasty, and did not do his job, or had panic attacks. Tr. 57. Even in jobs not dealing with the public, the Plaintiff was overwhelmed by having to drive or take a train. Tr. 58. The Plaintiff would rather work, but it was difficult for him to find a job and his previous job failures added to this difficulty. Tr. 64–65.

### 2. The Medical Evidence From September 1, 2008 to August 25, 2011

#### i. Callen–Lorde Community Health Center and Dr. Robert Kazenoff, M.D.

From August 4, 2009 to January 5, 2010, the Plaintiff received outpatient mental health treatment at Callen–Lorde Community Health Center. Tr. 227–31.

On August 4, 2009, the Plaintiff reported that he was on Celexa but stopped taking it because it was not working. Tr. 227. He complained that his depression and anxiety had returned. *Id.* He claimed that he had panic attacks whenever he went out. *Id.* The Plaintiff reported poor sleep, concentration, and energy level. *Id.* He reported that his appetite was "off and on." *Id.* The Plaintiff did not have a job or insurance. *Id.* He had a passive death wish, but had no manic periods. *Id.* A mental health examination indicated the Plaintiff's mood was depressed and anxious, but other findings were normal; his speech was within normal limits; his affect was of full range; his thought process was goal-directed; his thought content was normal, insight and judgment were fair to good; and his conduct was cooperative. *Id.* The Plaintiff was diagnosed with a major depressive disorder, a panic disorder with agoraphobia, which is a type of anxiety disorder, and generalized anxiety disorder. *Id.* The Plaintiff was prescribed a trial of Prozac for depression, increased amount of Klonopin or clonazepam for anxiety, and instructed to restart Trazodone for insomnia. *Id.*

On September 4, 2009, the Plaintiff complained that he still felt depressed and

that the Prozac had no effect. Tr. 228. He reported that the Trazodone helped him sleep and the increased Klonopin alleviated his anxiety. *Id.* The Plaintiff felt tired most of the time but had a "nervous energy." *Id.* An examination revealed that the Plaintiff's mood was depressed and anxious. *Id.* The Plaintiff's Prozac prescription was then increased, and he was instructed to continue using the other medications. *Id.*

On October 6, 2009, the Plaintiff's Prozac dosage was increased again after he reported no improvement. Tr. 228–29. On November 3, 2009, the Plaintiff reported that the Prozac may have started "to take some effect," but that he still felt anxious and depressed. Tr. 229. His focus was poor and he was sleeping more, sometimes too much. *Id.* Both Prozac and clonazepam were increased. Tr. 230.

On December 4, 2009, the Plaintiff indicated that he felt better after using the increased Prozac, but then worse again. *Id.* He claimed that, overall, he felt better on medication but was still symptomatic. *Id.* The Plaintiff described the depression as coming in waves but the anxiety was constant. *Id.* He complained about difficulty boarding the train and applying for jobs. *Id.* The clinician increased Klonopin and added Abilify. *Id.*

On January 5, 2010, the Plaintiff reported a "slight 'boost' from increased Prozac" and that the Klonopin helped. Tr. 231. The Plaintiff's amount of sleep had decreased, but the Trazodone helped. *Id.* His energy level was low and his focus was poor. *Id.* The clinician increased Prozac and continued other medications. *Id.* The clinician suggested that the Plaintiff go to Bellevue because he needed long-term treatment. *Id.*

Between April 20, 2010 and July 22, 2010, the Plaintiff received primary care treatment from Robert Kazenoff, M.D.

Tr. 236–40. On April 20, 2010, the Plaintiff listed his significant medical problems as: stomach problems, depression, anxiety, and back problems. Tr. 237. The Plaintiff listed fluoxetine (Prozac) and clonazepam (Klonopin) as medications he took regularly. *Id.* The Plaintiff's laboratory results were within normal range. *See* Tr. 238–40. Dr. Kazenoff prescribed Dicyclomine on June 24, 2010. Tr. 236. On July 22, 2010, Dr. Kazenoff found that he had an irritable bowel and prescribed clonazepam and bentyl. *Id.*

### ii. Federation Employment & Guidance Service (F.E.G.S.) Health and Human Services System

On May 24, 2010, the Plaintiff was initially evaluated by social worker Kira M. Mantell, Licensed Master Social Worker ("L.M.S.W.") at F.E.G.S. Health and Human Services System. Tr. 209–20. The Plaintiff described symptoms of shaking and hyperventilating, anger/yelling, sleeplessness, hyperactivity, irritability, psychomotor agitation, distractibility, mood lability, anxiety, and panic. Tr. 209. He stated that previous treatments were helpful and he wanted to improve his interpersonal relationships and vocational functioning. Tr. 208.

Mantell noted that the Plaintiff was appropriately dressed, spoke clearly, and was easy to engage. Tr. 209. The Plaintiff's mental status examination was normal except for poor concentration and memory, based on his reported difficulty in concentrating. Tr. 210–12. The Plaintiff disclosed that he occasionally used alcohol and marijuana and that marijuana use sometimes impacted his life by decreasing his motivation. Tr. 212.

The Plaintiff was not limited in his home management abilities, such as shopping, cooking, cleaning, and paying bills. Tr. 213. The Plaintiff spent most of his time

at home in his bedroom. *Id.* He read, watched movies and television, and looked for jobs on the internet. *Id.* The Plaintiff was close with his sister but felt distant from his parents. Tr. 216. The Plaintiff had a close friend whose autistic son at times he helped care for. Tr. 217.

The Plaintiff was diagnosed with mood disorder not otherwise specified (NOS), and panic disorder with agoraphobia. Also, it was decided to rule out polysubstance dependence in partial remission. He had a global assessment of functioning (GAF) score of 50. Tr. 219. Mantell recommended a psychiatric evaluation and weekly therapy sessions. Tr. 220.

On June 8, 2010, Mani Krishnamurthi, D.O. from F.E.G.S. performed a psychiatric evaluation on the Plaintiff. Tr. 198–206, 222–23. The Plaintiff complained of anxiety and reported feelings of helplessness, hopelessness, and worthlessness. Tr. 198, 201. The mental status examination also indicated a cooperative attitude toward the interview and normal appearance, behavior, awareness, mannerisms, speech, affect, mood, judgment, cognitive functioning, impulse control, and thought process and content. Tr. 201–03. Dr. Krishnamurthi determined that the Plaintiff was not a danger to himself, to others, or to property. Tr. 204. Dr. Krishnamurthi diagnosed the Plaintiff with mood disorder NOS, anxiety disorder NOS, rule out polysubstance dependence, and a GAF score of 55. Tr. 205. Dr. Krishnamurthi agreed with Mantell's recommendation of therapy but recommended that the Plaintiff also attend a substance abuse prevention program. *Id.* Dr. Krishnamurthi prescribed Depakote, directed the Plaintiff to decrease Prozac and taper off Klonopin, and referred the Plaintiff for a urine toxicology test. Tr. 206.

### iii. The Pederson–Krag Center

The Plaintiff did not return to F.E.G.S. Tr. 256. On June 28, 2010, the Plaintiff was evaluated by Lani Roye, Licensed Clinical Social Worker ("L.C.S.W.") at the Pederson–Krag Center. Tr. 256–65. The Plaintiff complained of a history of depression and anxiety, lack of motivation, decreased concentration, loss of enjoyment, severe anxiety, problems with anger, and hyperventilating. Tr. 256, 264. The Plaintiff stated that medications and therapy helped in 2008 and that he wanted to resume treatment. Tr. 256, 262. The Plaintiff was taking Prozac and an occasional Klonopin. Tr. 263. The Plaintiff smoked marijuana once or twice a week. Tr. 261. The Plaintiff was lonely and disconnected, but he did have a couple of good friends and supportive family. Tr. 256, 264–65. The Plaintiff's ability to do household chores and errands were described as "good," but his leisure activities were isolating. Tr. 264. A mental status examination found that the Plaintiff had a depressed and anxious mood, depressive thought content, and impaired attention/concentration. Tr. 257. Other elements of the examination were within normal limits. *Id.* The Plaintiff was assessed with major depressive disorder, recurrent moderate, without psychotic features, anxiety disorder NOS, cannabis abuse, and a GAF score of 45. Tr. 265.

On July 22, 2010, Kinga Koreh, M.D., a psychiatrist, evaluated the Plaintiff. Tr. 252–55. The Plaintiff reported worsening symptoms of anxiety and depression over the prior two years. Tr. 252. After receiving treatment at Callen–Lorde, the Plaintiff had moved to North Carolina. In North Carolina, he was treated and prescribed Prozac and Klonopin. *Id.* He returned to New York and sought treatment at F.E.G.S., but ended it because he disa-

greed with the psychiatrist who reportedly called him a drug addict. *Id.*

· The Plaintiff complained of an inability to focus and concentrate and irritability with people using phones on trains or driving badly. Tr. 252–53. The Plaintiff described a lifelong history of anxiety "about everything." Tr. 252. He stated that he had difficulty dealing with the public and would become angry; inevitably, he would be let go from his jobs. *Id.*

The mental status examination found that the Plaintiff was cooperative, pleasant, and neatly dressed and groomed. Tr. 254. The Plaintiff also engaged in self-soothing hand movements and had a depressed mood, anxious affect, and overproductive speech. *Id.* The Plaintiff's thought process was goal-directed; thought content was appropriate; and insight and judgment were adequate. *Id.* No psychotic processes were noted. *Id.*

Dr. Koreh made the following diagnoses: major depressive disorder, recurrent moderate; anxiety disorder NOS; cannabis abuse; rule out ADHD; rule out borderline personality disorder; and a GAF score of 45. Tr. 255. Dr. Koreh prescribed Trazodone for sleep and a trial of Lexapro. *Id.* She directed that the Plaintiff may take Klonopin rarely. *Id.*

From July 30, 2010 to October 15, 2010 and May 13, 2011 to August 5, 2011, the Plaintiff saw Roye almost weekly for therapy sessions. Tr. 282–91, 384–97. On July 30, 2010, the Plaintiff reported "nervous energy," feeling "shaky and tired," and an upset stomach. Tr. 282. On August 3, 2010, the Plaintiff complained of a continued upset stomach. *Id.* On August 10, 2010, the Plaintiff reported some decrease in his symptoms. Tr. 283.

On August 19, 2010, the Plaintiff followed up with Dr. Koreh. The Plaintiff's speech was somewhat overinclusive and rambling, but it was easily redirected. Tr. 284. The Plaintiff reported decreased symptoms but still had problems with focus and reading. Tr. 283. He felt more motivated and less tired and depressed. *Id.* He felt less irritable and less anxious in some situations, but was more irritable in crowded or noisy subways. *Id.* The Plaintiff was less nervous about the abandonment of friends. Tr. 283–84. The Plaintiff was caring for his friend's autistic son. Tr. 283. He still received unemployment benefits and did not feel up to a retail job; he wanted to find production assistant work. Tr. 284. Dr. Koreh noted that the Plaintiff appeared to have a partial response to Lexapro, so she increased the dosage. Tr. 284.

On August 26, 2010, Roye completed a functional assessment, which was cosigned by Dr. Koreh. Tr. 249–51; *repeated* at 306–08, 340–42. The Plaintiff was rated as having a "poor/none" ability to relate to others; deal with the public and stressors; maintain attention/concentration; carry out complex instructions; behave in an emotionally stable manner; and relate predictably in social situations. Tr. 249–50. The Plaintiff had a "fair" ability to use judgment, function independently, maintain personal appearance, and understand, remember, and carry out detailed instructions. *Id.* The Plaintiff had a "good" ability to demonstrate reliability and understand, remember, and carry out simple instructions. Tr. 250.

On August 27, 2010, the Plaintiff reported increased stress and anxiety from working with the autistic child. Tr. 284.

On February 18, 2011, the Plaintiff returned to see Roye, and she completed a comprehensive assessment. Tr. 369–81. The Plaintiff reported that therapy helped, but the antidepressant medications did not. Tr. 372–73, 379. He reported that he was isolated, lacked motivation, had anxi-

ety, and was depressed. Tr. 369. He lived with his parents because he could not find employment. *Id.* He was planning to enroll at Empire State College. Tr. 371. He was clean and sober for three months. Tr. 376, 379. Roye assessed his conditions as: major depressive disorder, recurrent; anxiety disorder; and cannabis abuse in early remission. Tr. 380.

On May 13, 2011, the Plaintiff complained that his dog walking job gave him anxiety and he was not sleeping well. Tr. 384. He also complained of irritability and trouble focusing. *Id.*

On May 20, 2011, the Plaintiff reported that he was sleeping better, but he had a three-day debilitating headache. *Id.*

On May 31, 2011, the Plaintiff complained that he was not sleeping well and was exhausted from walking dogs for three owners daily. Tr. 386. He drove to each site, which was stressful. *Id.* The Plaintiff started an online school and had met with his teacher twice. *Id.*

On June 28, 2011, the Plaintiff told Dr. Koreh that he quit his dog-walking job because he could not rely on his car and he had difficulty driving. Tr. 388–89. He said that the job was overwhelming and he became angry and nervous. Tr. 388. He stated that he would watch his friend's autistic child later that week. *Id.* The Plaintiff had finished his first paper for school, but had difficulty starting the second paper. *Id.* Dr. Koreh increased the Plaintiff's dose of Effexor and continued his other medications. Tr. 402.

On July 26, 2011, the Plaintiff stated that he had finished the online course and he was proud of this accomplishment. Tr. 398–99. He was motivated by the teacher, the material, and the fact that his parents were paying for the course. Tr. 398. The Plaintiff was considering taking another class. *Id.* However, the Plaintiff believed

that the Effexor was not working; he did not feel like his mood had changed; he was not motivated; and he occasionally felt like crying. *Id.* Dr. Koreh noted that the Effexor was mostly ineffective, so she tried augmentation with Prozac. *Id.*

### iv. Paul Herman, Ph.D.—SSA's Consultative Psychiatrist

On September 2, 2010, Paul Herman, Ph.D., performed a consultative psychiatric evaluation on the Plaintiff on behalf of the SSA. Tr. 268–71. The Plaintiff reported depressive and anxiety-related symptomatology, especially when he was with other people. Tr. 268. He became frustrated at work when things interfered with his optimal performance. Tr. 269. He complained that his symptoms interfered with his daily functioning in terms of activity level and choice of activities. Tr. 268–69. He was in a car accident earlier that year and has since avoided driving as much as possible. Tr. 268. The Plaintiff's psychological or psychiatric issues posed no significant difficulties with his daily living activities. Tr. 270.

The Plaintiff had good friends, but did not often socialize with them. *Id.* He lived with his parents, sister, and grandmother and reported having good family relationships. Tr. 269–70. He performed household chores and spent his time watching television, listening to the radio, going to movies, socializing with friends, and reading. Tr. 270. He denied a history of drug or alcohol use. Tr. 269.

The Plaintiff was cooperative and possessed adequate social skills. *Id.* There were no abnormalities in his gait, posture, motor behavior, or eye contact. *Id.* He was casually dressed and adequately groomed. *Id.* His speech was normal and thought process was coherent and goal directed, with no evidence of hallucinations, delusions, or paranoia. *Id.* His affect was of full range and appropriate in

speech and thought content. *Id.* His mood was neutral to euthymic, which is a normal, non-depressed mood. *Id.* His sensorium was clear, and he was oriented to person, place, and time. *Id.* His attention and concentration were intact. *Id.* His recent and remote memory skills were intact. Tr. 270. His cognitive functioning appeared to be in the average to above-average range, and his "general fund of information" was appropriate to experience. *Id.* His insight and judgment were fair to good. *Id.*

Dr. Herman diagnosed the Plaintiff as having an adjustment disorder with mixed anxiety and *depressed* mood. Tr. 271. Dr. Herman recommended continued psychological and psychiatric treatment. *Id.* He noted that the Plaintiff might benefit from a supportive vocational training environment. *Id.* Dr. Herman clarified that the diagnosis "do[es] not appear to be significant enough to interfere with the claimant's ability to function on a daily basis to the extent that all vocational functioning would be precluded." Tr. 270. The Plaintiff's prognosis was fair to good. Tr. 271.

### v. Joseph Gallo, M.D.—Social Security Administration's Consultative Physician

On September 2, 2010, Joseph Gallo, M.D., performed a consultative internal medicine examination on behalf of the SSA. Tr. 272–76. The Plaintiff complained of depression and anxiety, IBS, and scoliosis. Tr. 272. The Plaintiff was able to cook, clean, and shop. Tr. 273. He showered and bathed himself. *Id.* He enjoyed watching television, listening to radio, going to the movies, and reading. *Id.*

The Plaintiff was five feet and eleven inches tall and weighed 160 pounds. Tr. 273. He appeared to be in no acute distress, and his gait and stance were normal. *Id.* He used no assistive devices; could walk on heels and toes without difficulty;

and could squat fully. *Id.* He could rise from a chair without difficulty and did not need help changing for the examination or getting on and off the examination table. *Id.* The examination revealed scoliosis with the Plaintiff's lumbosacral spine deviated to the left. Tr. 274. The cervical and lumbar spine showed full range of motion and straight leg raising was negative bilaterally. *Id.* His abdomen examination was unremarkable. *Id.* Dr. Gallo diagnosed IBS, scoliosis, and history of depression and anxiety. *Id.* Prognosis was fair. *Id.* Due to his scoliosis and back pain, the Plaintiff had a mild restriction on sitting, standing, walking, climbing stairs, bending, lifting, and carrying. *Id.* Due to IBS, the Plaintiff had mild travel restrictions because he needed to be close to a restroom facility. *Id.*

### D. The ALJ's Decision

In a decision dated August 25, 2011, ALJ MacDougall concluded that the Plaintiff was not under a disability as defined under the SSA. Tr. 37–43. Initially, ALJ MacDougall found that the Plaintiff met the insured status requirement of the SSA through September 13, 2013. Tr. 37. He further found that the Plaintiff had not engaged in "substantial gainful activity" since the alleged onset of disability in September 1, 2008. *Id.* He also found that the Plaintiff had two severe impairments: depression and anxiety disorders. *Id.* However, ALJ MacDougall found that the Plaintiff's impairments did not meet or equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1502(d), 404.1525 and 404.1526). Tr. 38.

ALJ MacDougall also determined that the Plaintiff was unable to perform his past relevant work but retained the "residual functional capacity" (RFC) to perform

a full range of work at all exertional levels and to perform unskilled work with occasional contact with coworkers and the public. Tr. 39. ALJ MacDougall found that jobs existed in significant numbers in the national economy that the Plaintiff could perform given his residual functional capacity. Tr. 42.

In making his decision, ALJ MacDougall stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." Tr. 39. In his explanation, he summarized the Plaintiff's treatment history from Callen Lorde Community Health Center and F.E.G.S. *See Id.* He also reviewed the Plaintiff's treatment at Pederson–Krag with Dr. Koreh. *See* Tr. 39–40. However, significantly, ALJ MacDougall did not indicate any weight he accorded to the Plaintiff's treating physicians' opinions. *See* Tr. 39–40.

Then, ALJ MacDougall discussed the findings of two physicians who performed evaluations on behalf of the SSA. *See* Tr. 40–41. Indeed, ALJ MacDougall "accord[ed] considerable weight to the opinion of Paul Herman, Ph.D.," the consultative psychiatrist. Tr. 41. ALJ MacDougall indicated that he gave "some weight to the opinion of Joseph Gallo, M.D.," the second consultative physician. *Id.*

### E. The Evidence Plaintiff Submitted to the Appeals Council After the ALJ's Decision

After the ALJ August 25, 2011 decision, the Plaintiff submitted additional evidence to the Appeals Council. He submitted: (1) notes from Dr. Kazenoff from April 20, 2010 through February 3, 2012 regarding treatment for gastroesophageal reflux disease (GERD), gastritis, and anxiety (Tr. 403–04); (2) a November 4, 2011 assessment by Roye, cosigned by Dr. Koreh on

November 15, 2011 (Tr. 428–30); (3) a medication sheet by Dr. Koreh for the period August 18, 2011 through December 13, 2011 (Tr. 462); (4) an October 20, 2011 letter from Roye stating that the Plaintiff was unable to find gainful employment for the past year (Tr. 502); (5) treatment notes from Dr. Koreh and Roye from November 15, 2011 through May 30, 2012 (Tr. 533–34, 537–44, 547–94); (6) a February 10, 2012 form indicating he was exempt from temporary assistance work requirements for six months and (Tr. 195); and (7) a June 13, 2012 assessment by Roye which listed diagnoses and treatment (Tr. 530).

### F. The Appeals Council Decision

In a notice dated June 19, 2013, the Appeals Council denied the Plaintiff's appeal of the ALJ's August 25, 2011 decision. Tr. 5–12.

The Appeals Council found that the ALJ's action, finding and conclusion were not contrary to the weight of the evidence currently on record. Tr. 6.

### III. DISCUSSION

### A. The Standard of Review

An unsuccessful claimant for Social Security benefits may bring an action in federal district court to obtain judicial review of the denial of his or her benefits "within sixty days after the mailing ... of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. §§ 405(g), 1383(c)(3). When reviewing the decision of the Commissioner, the Court may set aside the determination only if the decision was based on legal error or was not supported by substantial evidence in the administrative record. *See* 42 U.S.C. § 405(g); *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir.2003); *Brown v. Apfel*, 174 F.3d 59, 61–62 (2d Cir.1999); *Tejada v.*

*Apfel*, 167 F.3d 770, 773 (2d Cir.1999). Substantial evidence is "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), and requires such relevant evidence that a reasonable person "might accept as adequate to support a conclusion." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008).

■ In addition, the Commissioner must accord special evidentiary weight to the opinion of the treating physician, as long as the treating physician's opinion is supported by medically acceptable techniques, results from frequent examinations, and is consistent "with the other substantial evidence in [the] case record." *See Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.1998). When the Commissioner chooses not to give the treating physician's opinion controlling weight, he must give "good reasons in his notice of determination or decision for the weight he gives the claimant's treating source's opinion." *Id.*

■ In determining whether the Commissioner's findings are supported by substantial evidence, the Court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir.1983). Further, the Court must keep in mind that "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark*, 143 F.3d at 118. Therefore, when evaluating the evidence, "the court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon ['*de novo*'] review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir.1991) (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)). A reviewing court may "enter a judgment affirming, modifying, or revers-

ing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## B. The Analytical Framework for Determining Disability

To qualify for disability benefits under 42 U.S.C. § 423(d)(1)(A), a plaintiff must establish his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than twelve months." *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir.2004). The Act also provides that the impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.*

Federal regulations set forth a five-step analysis that the ALJ must follow when evaluating disability claims, including: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a "severe" medically determinable physical impairment which will impair the claimant from doing basic work activities; (3) whether the claimant's severe medical impairment, based solely on medical evidence, is a limitation that is listed in Appendix 1 of the regulations; (4) an assessment of the claimant's RFC and ability to continue past relevant work despite severe impairment; and (5) an assessment of the claimant's RFC along with age, education, and work experience. As to the last stage of the inquiry, the burden shifts to the SSA to show that the claimant can perform alternative work. *See* 20 C.F.R. §§ 404.1520, 416.920.

When proceeding through this five-step analysis, the ALJ must consider the objec-

tive medical facts; the diagnoses or medical opinions based on these facts; the subjective evidence of pain and disability; and the claimant's educational background, age, and work experience. *Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir.1999).

### C. As to Whether the ALJ's Finding is Supported by Substantial Evidence

The Court finds that the ALJ's decision was not supported by substantial evidence. In this regard, the Court finds there was no "relevant evidence [that] a reasonable mind might accept as adequate to support [the] conclusion[ ]" of the ALJ. *Zabala v. Astrue,* 595 F.3d 402, 408 (2d Cir.2010) (internal quotation marks and citation omitted).

#### 1. As to Whether the ALJ Failed to Properly Weigh the Medical Evidence

The Plaintiff argues that the ALJ did not afford the appropriate weight and consideration to the Plaintiff's treating physicians. "[A] treating physician's opinion about the nature and severity of a claimant's impairments is entitled to 'controlling weight' if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Gorman v. Colvin,* No. 13–CV–3227 (JG), 2014 WL 537568, at *4, 2014 U.S. Dist. LEXIS 16379, at *10 (E.D.N.Y. Feb. 10, 2014) (quoting 20 C.F.R. § 404.1527(c)(2)). Indeed, "the ALJ cannot rely solely on [the] RFCs [of the consulting examiners] as evidence contradicting the Treating Physician RFC. This is because an inconsistency with a consultative examiner is not sufficient, on its own, to reject the opinion of the treating physician." *Moore v. Astrue,* 07–cv–5207 (NGG), 2009 WL 2581718, at *10 n. 22, 2009 U.S. Dist. LEXIS 81449, at *33 n.

22 (E.D.N.Y. Aug. 21, 2009). "The Second Circuit has repeatedly stated that when there are conflicting opinions between the treating and consulting sources, the 'consulting physician's opinions or report should be given limited weight.'" *Harris v. Astrue,* 07–CV–4554 (NGG), 2009 WL 2386039, at *14, 2009 U.S. Dist. LEXIS 67009, at *40 (E.D.N.Y. July 31, 2009) (quoting *Cruz v. Sullivan,* 912 F.2d 8, 13 (2d Cir.1990)).

Nevertheless, "[a]lthough the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004) (citations omitted). In addition, "the Commissioner must set forth 'good reasons' for refusing to accord the opinions of a treating physician controlling weight." *Gorman,* 2014 WL 537568 at *10 (E.D.N.Y. Feb. 10, 2014) (quoting 20 C.F.R. § 404.1527(c)(2)). "She must also give 'good reasons' for the weight actually given to those opinions if they are not considered controlling." *Id.* (quoting *Halloran,* 362 F.3d at 33).

"An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that

tend to support or contradict the opinion." *Id.* In addition, "the regulations also specify that the Commissioner will always give good reasons in [his] notice of determination or decision for the weight [he] gives claimant's treating source's opinion." *Id.* (citations and internal quotation marks and alterations omitted).

Here, as noted above, the ALJ concluded that the Plaintiff retained the RFC to perform unskilled work with occasional contact with coworkers and the general public. Tr. 39–41. In particular, the ALJ found that: the Plaintiff had medically determinable impairments that could reasonably be expected to cause the alleged symptoms, but that the Plaintiff's statements concerning intensity, persistence and limiting effects of the symptoms were not credible; the Plaintiff's symptoms waxed and waned in relation to medication and financial stress; the Plaintiff had no problem communicating or concentrating; the Plaintiff's part-time work, testimony, and submissions indicate his ability to perform activities of daily living; and while the Plaintiff did have some anxiety issues, but they were not significant enough to preclude employment. Tr. 41.

The ALJ based his decision primarily upon the opinion of the consultative examiner, Dr Paul Herman. *Id.* Although Dr. Herman diagnosed an adjustment disorder with mixed anxiety and depressed mood, he clarified his opinion in that the diagnosis "do[es] not appear to be significant enough to interfere with the claimant's ability to function on a daily basis to the extent that all vocational functioning would be precluded." Tr. 270–71.

The ALJ also partially relied on the opinion of the consultative examiner, Dr. Gallo. Tr. 41. Dr. Gallo found that the scoliosis in the Plaintiff's lumbosacral spine deviated to the left. Tr. 274. Dr. Gallo found no abnormalities with Plaintiff's abdomen. *Id.* Dr. Gallo was of the opinion that Plaintiff had a mild restriction on sitting, standing, walking, bending, lifting, carrying, and climbing stairs. *Id.* Further, Dr. Gallo stated that the Plaintiff had a mild travel restriction because he needed to be near a restroom facility. *Id.*

■ Here, the Court finds that the ALJ improperly relied upon Dr. Herman and Dr. Gallo's assessments and erred in giving little weight to the opinions of the treating physician, without sufficient explanation. First, Dr. Koreh's findings were not contrary to other substantial evidence in the record. The substantial evidence in the record indicates that the Plaintiff suffered from depression and anxiety disorders. In fact, Dr. Herman, the consultative psychiatrist, diagnosed Plaintiff with a psychological illness and recommended continued psychological and psychiatric treatment. *See* Tr. 271 (diagnosing "[a]djustment disorder with mixed anxiety and depressed mood").

Second, the ALJ failed to accord any weight to the treating physician's opinion. *See* Tr. 39–40. The ALJ summarized the treating and consultative physicians' opinions and then accorded all the weight to the consultative physicians. *See* Tr. 41 (according "considerable weight to the opinion of Paul Herman, Ph.D." and according "some weight to the opinion of Joseph Gallo, M.D."). The ALJ failed to consider the requisite factors and provide good reason for determining the weight to give the treating source's opinion. *See* Tr. 39–40. For instance, the ALJ should have considered the length of time Dr. Koreh treated the Plaintiff; the evidence supporting Dr. Koreh's opinion; the consistency of Dr. Koreh's opinion with the record as a whole; and the fact that Dr. Koreh is a psychiatrist.

■ " 'Where an ALJ fails to consider all of the relevant factors in deciding what weight to assign the opinion of a treating physician, the ALJ's decision is flawed.' " *Box v. Colvin*, 12–CV1317 (ADS), 3 F.Supp.3d 27, 44, 2014 WL 997553, at *17, 2014 U.S. Dist. LEXIS 35263, at *45 (E.D.N.Y. Mar. 14, 2014) (quoting *Rivas v. Barnhart*, No. 01 Civ. 3672(RWS), 2005 WL 183139, at *22, 2005 U.S. Dist. LEXIS 1114, at *65–66 (S.D.N.Y. Jan. 27, 2005)). " 'Failure to provide reasons for rejecting the treating physician's opinion is a proper basis for reversal and remand.' " *Id.* at *17, 2014 U.S. Dist. LEXIS 35263 at *45–46 (quoting *Melendez v. Astrue*, No. 08 Civ. 6374(LBS), 2010 WL 199266, at *3, 2010 U.S. Dist. LEXIS 4241, at *3 (S.D.N.Y. Jan. 20, 2010)).

Accordingly, the Court finds that the ALJ erred in not according any weight to the treating physicians' opinions.

### 2. As to Whether the ALJ Failed to Properly Develop the Record for the Pro Se Claimant

■ When a claimant proceeds *pro se*, the ALJ has a heightened duty to develop the record. *Moran v. Astrue*, 569 F.3d 108, 113 (2d Cir.2009) (citing *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir.1990)). "The ALJ must 'adequately protect a *pro se* claimant's rights by ensuring that all of the relevant facts are sufficiently developed and considered' and by 'scrupulously and conscientiously prob[ing] into, inquir[ing] of, and explor[ing] for all the relevant facts.' " *Moran*, 569 F.3d at 113 (quoting *Cruz*, 912 F.2d at 11). "[W]hen a claimant appears [*pro se*] and is otherwise impaired, [the courts] must 'make a searching investigation of the record to make certain that the claimant's rights have been adequately protected.' " *Id.* "A reviewing court must determine whether the ALJ 'adequately protect[ed] the rights

of [a *pro se*] litigant by ensuring that all of the relevant facts [are] sufficiently developed and considered.' " *Echevarria v. Sec'y of Health & Human Serv.*, 685 F.2d 751, 755 (2d Cir.1982).

■ In this case, the Court finds that the ALJ did not properly develop the record for the *pro se* Claimant. "[T]he duty to protect the rights of [*pro se*] claimants by developing 'all the relevant facts' calls for much more than a reliance on the contrary conclusions of a non-treating medical advisor." *Id.* at 756 (quoting *Hankerson v. Harris*, 636 F.2d 893, 896 (2d Cir.1980)). In this case, the ALJ disregarded the treating physician's opinion and relied on the conclusions of non-treating physicians. If the ALJ believed the medical record from the Plaintiff's treating physician was insufficient, the ALJ was required to take affirmative steps to develop the record before disregarding the treating physician's opinion. There is no indication that the ALJ made any such attempt to develop the record or communicate any concerns to the Plaintiff regarding the treating physician's reported findings.

For that reason, the Court finds that the ALJ failed to properly develop the record for the *pro se* claimant.

### IV. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the Defendant's motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) is denied and Plaintiff's motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) to reverse the August 25, 2011 decision of the Defendant Acting Commissioner of Social Security is granted. The case is remanded for another hearing consistent with this Memorandum of Decision and Order.

**286**

The Clerk of the Court is directed to close this case.

**SO ORDERED.**