Pamela L. CASSELBURY, Plaintiff,

v.

Carolyn W. COLVIN, Acting Commissioner of Social Security, Defendant.

No. 13–CV–6289 EAW.

United States District Court, W.D. New York.

Signed March 13, 2015.

Peter A. Gorton, Lachman & Gorton, Endicott, NY, for Plaintiff.

Amanda Lockshin, Social Security Administration, New York, NY, Kathryn L. Smith, U.S. Attorney's Office, Rochester, NY, for Defendant.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, District Judge.

## I. INTRODUCTION

Plaintiff Pamela L. Casselbury ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking review of the final decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("the Commissioner"), denying Plaintiff's application for disability insurance benefits. (Dkt. 1). Plaintiff alleges that the decision of Administrative Law Judge ("ALJ") Thomas P. Tielens was not supported by substantial evidence in the record and was based on erroneous legal standards.

Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 14, 17). For the reasons set forth below, the Commissioner's motion for judgment on the pleadings (Dkt. 17) is denied, Plaintiff's motion (Dkt. 14) is granted in part, and this matter is remanded for further administrative proceedings.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Overview

On September 29, 2009, Plaintiff protectively filed an application for disability insurance benefits. (Administrative Transcript (hereinafter "Tr.") 133–38). In her application, Plaintiff alleged a disability onset date of June 26, 2008. (Tr. 133, 143). Plaintiff alleged the following disabilities: sciatica, herniated L4–L5 disc, degenerative disc disease, and blood disorder. (Tr. 148). Plaintiff's application was denied on January 27, 2010. (Tr. 82–85).

On January 24, 2011, Plaintiff, represented by counsel, testified at a hearing before ALJ Tielens. (Tr. 52–78). On March 4, 2011, the ALJ issued a finding that Plaintiff was not disabled within the meaning of the Social Security Act. (Dkt. 1 at 6–19).

On January 11, 2013, the Appeals Council denied Plaintiff's request for review. (Dkt. 1 at 40). The Appeals Council set

aside that decision to consider additional information and again denied Plaintiff's request for review on January 30, 2013, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 40–44). On June 6, 2013, Plaintiff filed this civil action appealing the final decision of the Commissioner. (Dkt. 1).

## B. The Non–Medical Evidence

Plaintiff was born on April 14, 1961, and was 49 years old on the date last insured. (Dkt. 1 at 18; Tr. 56). Plaintiff graduated from high school and had some training in child care. (Tr. 56). Plaintiff had previously worked as a construction worker, school bus driver, and lunch monitor. (Tr. 57–59, 64, 66, 149). Plaintiff testified that she lived with her husband and son. (Tr. 60).

She could not drive due to the medications she was on, but did not have a driver's license because she had "gotten a DWI." (Tr. 61). Plaintiff was incarcerated for approximately two months as a result of her most recent DWI arrest after she removed her ankle monitor. (Tr. 62–64).

Plaintiff left her last job as a school bus driver after an arrest for hitting a woman that her husband worked with because she was on probation with the school district, and such an arrest violated her probation. (Tr. 65).

Plaintiff claimed that she was alleging disability due to back pain. (Tr. 67). Plaintiff claimed that she had pain in her limbs, neck, and head. (Tr. 61, 67). Plaintiff stated that she had no recollection of how her back pain started, but said that she went to the emergency room for the pain and has been in pain ever since. (Tr. 67). Plaintiff testified that she had been to physical therapy one time, and that she had received spinal injections twice. (Tr. 68). She had been told that surgery would not improve her symptoms. (Tr. 69).

Plaintiff took pain medications, but could not recall their names. (*Id.*). Plaintiff wore a TENS unit to help with her back pain. (Tr. 69–70). Plaintiff claimed that the pain was "like lightning bolts." (Tr. 72).

Plaintiff wore a brace on her right wrist for carpal tunnel syndrome. (Tr. 70). Plaintiff stated that she had difficulty with buttons and snaps because her right hand was often numb. (Tr. 73). She needed to use two hands to lift a gallon of milk. (*Id.*). Plaintiff testified that she could wash dishes, but needed to take breaks while doing it. (Tr. 74). Plaintiff did laundry, but was unable to carry a laundry basket, so she had to carry a few clothes at a time. (*Id.*).

Plaintiff testified that she could bend part way down, but had a hard time standing upright again. (Tr. 75). She had a difficult time standing in the shower because of pain, and could not walk or run without pain. (Tr. 76). Plaintiff claimed that it hurt to get dressed, brush her teeth, comb her hair, get washed, or shave her legs. (*Id.*). Plaintiff testified that she had been prescribed Valium to help her sleep, because her pain would wake her up in the night. (Tr. 77–78).

## C. Summary of the Medical Evidence

The Court assumes the parties' familiarity with the medical record, which is summarized below.

Emergency department records from Robert Packer Hospital in Sayre, Pennsylvania, dated June 26, 2008, indicate that Plaintiff sought treatment for left leg and back pain after she injured her back while working in her garden. (Tr. 235). Dr. Russell Burkett examined Plaintiff and noted that Plaintiff had a full range of motion, full strength, and normal reflexes. (*Id.*). Plaintiff was advised to use warm

compresses and take Naproxyn for "probable sciatica." (Tr. 235–37).

On July 28, 2008, Plaintiff treated at Kinsley Chiropractic Center for left leg pain. (Tr. 242–43, 245–46). Plaintiff reported numbness and sharp pain in her left leg at her July 30, 2008, and August 1, 2008, appointments, but a note from August 11, 2008, indicated that Plaintiff was "improving overall." (Tr. 243–44).

On January 29, 2009, Plaintiff treated with nurse practitioner ("NP") Nancy Kemp, for complaints of incontinence. (Tr. 290–91). NP Kemp noted Plaintiff's reported back pain and referred Plaintiff to physical therapy. (Id.).

Plaintiff treated with physical therapist ("PT") Whitney Mitchell on February 5, 2009, for pain and numbness in her left buttock and leg. (Dkt. 247). PT Mitchell noted that Plaintiff presented with "full ROM, joint mobility and flexibility of the lumbar spine which rules out underlying disc pathology or compression of nerve roots creating current pain." (Tr. 249).

On February 10, 2009, Plaintiff treated with chiropractor William Bauman for left-side leg pain and sciatica. (Tr. 225). A review of MRI results showed an L5–S1 disc herniation. (Id.). NP Kemp noted on these MRI results that Plaintiff had "no significant stenosis or impingement on nerve," and noted that Plaintiff should follow up with a chiropractor as neurosurgery was not indicated based on the test results. (Tr. 270).

Dr. Erik Gregorie of Guthrie Clinic in Sayre, Pennsylvania, examined Plaintiff on March 23, 2009. (Tr. 258–59). Dr. Gregorie observed that Plaintiff's station, gait, muscle strength, and motor tone were normal. (Tr. 258). Plaintiff was oriented to time, place, and person, her memory was intact, and her language function was normal. (Id.). Dr. Gregorie reviewed Plain-

tiff's February 6, 2009 MRI results and concluded that Plaintiff had "a small central disc that results in some deformity of the tecal sac but does not result in any nerve root compression." (Id.). Dr. Gregorie concluded that he could not recommend any consideration for surgery, but referred Plaintiff to the pain clinic. (Tr. 259).

On April 3, 2009, Dr. Burdett Porter of the Sayre Pain Clinic examined Plaintiff for complaints of numbness, tingling, and aching in her back and left leg. (Tr. 260). Dr. Porter noted that Plaintiff exhibited pain in her lumber back and tenderness in her left lower leg and foot on examination, but her physical exam was otherwise normal. (Tr. 261). Dr. Porter assessed sciatica, lumbar disc displacement, and degenerative disc disease. (Tr. 262). On May 7, 2009, Dr. Porter performed a left L5–S1 transforaminal epidural steroid injection. (Tr. 272).

On June 2, 2009, Plaintiff approached Dr. Khalid Sethi for a second opinion concerning potential neurosurgery. (Tr. 283). On examination, Plaintiff was awake, alert, and appropriate in speech. (Tr. 284). Dr. Sethi noted that Plaintiff's motor examination was "fairly good" with "a little bit of giveaway weakness." (Id.). Dr. Sethi further noted some discomfort on Plaintiff's left side. (Id.). His impression was for "[l]eft L5 radiculopathy secondary to L5–S1 herniated nucleus pulposus." (Id.). Dr. Sethi opined that Plaintiff may benefit from an L5 nerve root block. (Id.).

Plaintiff received an additional steroid injection on June 11, 2009, after reporting that the May 2009 injection had no effect. (Tr. 273).

Plaintiff visited Dr. Sethi on August 11, 2009, reporting that she only received approximately three days of pain relief following her June 2009 injection. (Tr. 282). Plaintiff reported memory troubles, and

stated that she had been involved in a "DWI" that she believed could be related to her self-doubling her dosage of Lyrica. (*Id.*). Dr. Sethi did not think that Plaintiff's blood alcohol level would be impacted by the Lyrica or narcotics. (*Id.*).

On September 8, 2009, Plaintiff treated with Dr. Xiao Fang at the Center for Pain Relief for back pain radiating down to the leg. (Tr. 286). Plaintiff's musculoskeletal exam revealed no focal muscle weakness, but decreased sensation in the left L4–L5 dermatome distribution with tenderness in the lumbar paraspinal region. (*Id.*). Dr. Fang's noted impression was "back pain with mild L5–S1 disc herniation." (*Id.*). Dr. Fang filled a prescription for Plaintiff to try a TENS unit. (*Id.*).

NP Kemp treated Plaintiff on September 16, 2009, for complaints of right arm pain that had started without explanation approximately two weeks earlier. (Tr. 288). On examination, Plaintiff had a full range of motion in her arm, but reported that her thumb was numb and that her pain worsened when she laid down or coughed. (*Id.*). NP Kemp assessed "pain in joint, shoulder region" and prescribed pain medications. (Tr. 289).

On September 30, 2009, NP Kemp noted that Plaintiff complained of worsening back pain that went down her leg and arm. (Tr. 389). Plaintiff indicated that her pain had worsened since she stopped taking prednisone. (*Id.*). NP Kemp assessed sciatica, depression, and neuropathy. (Tr. 390). NP Kemp resumed a short course of prednisone and increased her dosage of Elavil to help with pain and depression. (*Id.*).

Dr. Richard Flynn examined Plaintiff on October 20, 2009, for complaints of "extreme pain." (Tr. 397). Plaintiff reported neck and back pain, but was negative for myalgias, joint pain, or falls. (Tr. 398). Plaintiff reported tingling, sensory change,

focal weakness, and memory loss. (*Id.*). An objective examination showed a normal range of motion with no edema or tenderness. (Tr. 399). Plaintiff was alert and oriented, and displayed normal reflexes and muscle tone. (*Id.*). Plaintiff had a normal gait and normal coordination. (*Id.*). Dr. Flynn assessed cervical pain, and lumbar disc displacement. (*Id.*).

On October 27, 2009, Plaintiff visited Dr. Han Suk Koh for a neurological consultation. (Tr. 444). Dr. Koh concluded that there was evidence of dysfunction in the neck, but stated he did not "appreciate any significant lumbar radiculopathy in lower extremity." (*Id.*).

Dr. Gregorie noted on November 16, 2009, that Plaintiff's symptoms of pain had improved, although she presented with complaints of neck and right arm pain since September 2009. (Tr. 401). Plaintiff appeared alert, oriented, in no acute distress, with normal muscle strength and motor tone. (Tr. 402–03). Dr. Gregorie diagnosed cervical radiculopathy and cervical spinal stenosis, and referred Plaintiff to physical therapy. (Tr. 403–04).

On December 16, 2009, Dr. Pranab Datta conducted a consultative internal medicine examination. (Tr. 327–31). Plaintiff reported back pain with numbness in her left leg and foot as well as right shoulder pain that radiated to her hands, with possible carpal tunnel syndrome in her right hand. (Tr. 327). Plaintiff stated that she did some cooking and cleaning three times per week, but found it hard to stand. (Tr. 328). Plaintiff lived with her husband and 14 year old son. (*Id.*). Plaintiff did laundry twice per week with the assistance of her husband and was able to shop once per week with the assistance of a shopping cart. (*Id.*). Plaintiff stated that she showered once per week and changed her clothes three times per week. (*Id.*).

On exam, Dr. Datta noted that Plaintiff appeared to be "in moderate distress and restless because of the pain." (*Id.*). Dr. Datta observed that Plaintiff had an abnormal gait, hung onto the table with one hand while squatting, required an assist while getting on and off the exam table, and used both hands to rise from the chair. (*Id.*). Dr. Datta noted that Plaintiff was "in tears" while he conducted the musculoskeletal examination, and that Plaintiff had a full range of motion, but expressed pain with movement. (Tr. 329). Plaintiff had a full range of motion in her shoulders, elbows, forearms, wrists, hips, knees, and ankles. (*Id.*). Plaintiff had full strength in her upper extremities and right lower extremity, with 4/5 strength in her left lower extremity. (*Id.*). Plaintiff's hand and finger dexterity was intact with full grip strength. (Tr. 330). Dr. Datta diagnosed "cervical spondylosis, complicated by severe pain in the right upper limb," "low back pain, secondary degenerative disk disease," and nicotine addiction. (*Id.*). Dr. Datta opined that Plaintiff's general condition was stable, but that Plaintiff had "major limitations for all physical activities because of the above problems." (*Id.*).

On January 6, 2010, Sara Long, Ph.D., performed a consultative psychiatric examination. (Tr. 333–39). Plaintiff appeared "neat and well-groomed" but had a slow gait. (Tr. 334). Plaintiff was "coherent and goal oriented," and Dr. Long found "no indication of any sensory or thought disorder." (*Id.*). "[S]ome depression was noted by weeping." (*Id.*). Plaintiff was well oriented, but could not subtract 3 from 20 due to apparent distraction. (*Id.*). Plaintiff was able to repeat three objects immediately, and after five minutes, she recalled one of the three objects. (*Id.*). Dr. Long opined that Plaintiff was able to follow and understand simple directions and instructions and perform simple tasks independently. (Tr. 335). Plaintiff could maintain attention and concentration, but appeared distracted with discomfort. (*Id.*). Dr. Long further opined that Plaintiff could maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and have adequate stress management skills, although Plaintiff had a low stress threshold at the time of the examination. (*Id.*). Dr. Long noted Plaintiff's history of substance abuse and reliance on Valium for pain. (*Id.*). Dr. Long diagnosed Plaintiff with adjustment disorder with depression, as well as alcohol substance abuse—provisional. (Tr. 336).

Plaintiff followed up with Dr. Gregorie on January 25, 2010, and had not yet gone to physical therapy due to insurance coverage issues. (Tr. 405). Dr. Gregorie noted that Plaintiff's right arm pain had resolved, although Plaintiff continued to have discomfort in her lower left extremity. (*Id.*). Dr. Gregorie stated that Plaintiff's symptoms were "fleeting and migratory and did not clearly form a coherent pattern that would allow for localization." (*Id.*). He further recommended Plaintiff participate in physical therapy. (*Id.*).

On January 26, 2010, state agency psychiatrist Dr. R. Altmansberger reviewed Plaintiff's medical records and completed a Psychiatric Review Technique Form. (Tr. 345–62). Dr. Altmansberger assessed "adjustment depressed" disorder, pain disorder, and history of alcohol use. (Tr. 348, 351, 353). Dr. Altmansberger opined that Plaintiff was able to execute, follow, and understand simple directions and instructions, with moderate limitations in attention and concentration due to pain. (Tr. 361). Dr. Altmansberger further found that Plaintiff could maintain a regular schedule, learn new tasks, make appropriate decisions, and relate adequately with others, although she may have moderate limitations due to stress. (*Id.*).

On February 19, 2010, Dr. Himanshu Paliwal noted that Plaintiff exhibited a decreased range of motion in her lumbar back, but exhibited no tenderness. (Tr. 486). Plaintiff was alert and oriented with normal sensation and reflexes, but Plaintiff was limping and bearing weight on her right side. (Id.). Dr. Paliwal assessed memory loss episodes and left leg pain. (Id.).

On March 1, 2010, Dr. Paul E. Buckthal examined Plaintiff for evidence of seizures as a result of Plaintiff's reported memory loss. (Tr. 448). Dr. Buckthal found no definite abnormality. (Id.). An MRI of Plaintiff's brain conducted on March 3, 2010, revealed "small vessel disease changes in the white matter ... of questionable but doubtful clinical significance." (Tr. 451).

On March 16, 2010, Plaintiff participated in a sleep study, which showed no sleep apnea, but revealed moderate periodic limb movement disorder. (Tr. 449).

Plaintiff followed up with Dr. Koh on May 10, 2010, and Dr. Koh noted that Plaintiff was alert and oriented with full strength in her upper and lower extremities. (Tr. 488). Dr. Koh assessed cervical radiculopathy and periodic limb movement disorder. (Id.). Plaintiff reported that her pain had improved with Lyrica. (Tr. 489). Dr. Koh prescribed Mirapex to assist with her periodic limb movement. (Id.).

On May 24, 2010, Plaintiff informed Dr. Koh that she stopped taking Mirapex because she did not believe that it helped her symptoms. (Tr. 490). Plaintiff reported having blackouts every day and memory loss. (Id.). Dr. Koh prescribed Requip for Plaintiff's periodic limb movement. (Tr. 492).

Plaintiff treated at Robert Packer Hospital on July 1, 2010, for complaints of pain. (Tr. 471). Dr. George L. Ellis noted that his impression was for depression and reported chronic pain. (Id.).

On July 17, 2010, Plaintiff treated with Dr. Koh, complaining of cramps and pain in her legs, neck, arms, and lower back, with memory loss. (Tr. 493). Dr. Koh noted that Plaintiff demonstrated "multiple trigger points in more than 11 out of 18 points." (Tr. 494). Dr. Koh noted that Plaintiff "most likely" had fibromyalgia syndrome as a result of noted trigger points. (Tr. 495).

In a letter dated July 22, 2010, Dr. Koh opined that Plaintiff could not bend over, flex, extend the neck or back, push or pull weight over two pounds, or squat due to pain. (Tr. 455). Dr. Koh noted that Plaintiff had "multiple trigger points which may suggest fibromyalgia." (Id.). Dr. Koh opined that Plaintiff was "unable to attend any counseling sessions, classes, physical work until her current problems have been resolved." (Id.).

Treatment notes of Dr. Koh dated July 28, 2010, stated that Plaintiff's neurological exam was limited as a result of Plaintiff's discomfort and pain. (Tr. 497). Plaintiff had full strength in her upper and lower extremities. (Tr. 498). Dr. Koh noted that Plaintiff had multiple trigger points which may suggest fibromyalgia, and referred Plaintiff to rheumatology and neurosurgery. (Id.).

On August 4, 2010, Dr. Jackie Clowes of Sayre Rheumatology examined Plaintiff for pain complaints. (Tr. 518). Dr. Clowes noted that Plaintiff was stressed due to an upcoming court date for her "DUI." (Id.). Plaintiff reported that Lyrica helped her pain, but she received no benefit from epidurals or use of a TENS unit, and she had not attended physical therapy. (Id.). Plaintiff's neurological exam was normal. (Tr. 520). Plaintiff had a full range of movement in her shoulder,

elbow, wrists, hip, knee, and ankle. (*Id.*). Dr. Clowes noted that Plaintiff originally had a limited range of motion in her cervical spine, but that it improved with distraction. (*Id.*). Dr. Clowes noted "diffuse tenderness all over with multiple tender spots." (*Id.*). Dr. Clowes assessed neck pain, degenerative disc disease, lumbar back pain, fibromyalgia, unspecified sleep disturbance, and multiple financial and social stressors. (Tr. 521). Dr. Clowes provided Plaintiff with literature on fibromyalgia and instructed Plaintiff to follow up with her primary care provider to discuss long term management. (*Id.*).

On January 13, 2011, NP Kemp assessed carpal tunnel syndrome and noted that Plaintiff was caring for a newborn and needed to be careful carrying the infant. (Tr. 513).

## III. DISCUSSION

### A. Standard of Review

■ This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3). "In reviewing a decision of the Commissioner, the Court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing.'" *Emerson v. Comm'r of Soc. Sec.*, No. 12 Civ. 6451(PAC)(SN), 2014 WL 1265918, at *9 (S.D.N.Y. Mar. 27, 2014) (quoting 42 U.S.C. § 405(g)). 42 U.S.C. § 405(g) directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record. Substantial evidence is "more than a mere scintilla," and "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.1987).

■ Therefore, the scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating the plaintiff's claim, and whether the Commissioner's findings were supported by substantial evidence in the record. *See Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir.1983) (stating that a reviewing Court does not examine a benefits case *de novo* ). If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *See Perez v. Chater*, 77 F.3d 41, 46–47 (2d Cir.1996).

■ Judgment on the pleadings may be granted under Rule 12(c) where the "material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir.1988).

### B. Determining Disability Under the Social Security Act

■ The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see Rembert v.*

*Colvin,* No. 13–CV–638A, 2014 WL 950141, at *6 (W.D.N.Y. Mar. 11, 2014). A disabling impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostics techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). The burden is on the claimant to demonstrate that he is disabled within the meaning of the Act. *See Draegert v. Barnhart,* 311 F.3d 468, 472 (2d Cir.2002). The individual will only be declared disabled if his impairment is of such severity that he is unable to do his previous work and cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful activity. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the ALJ follows a five-step sequential analysis. If the ALJ makes a determination at any step, the evaluation will not continue to the next step. 20 C.F.R. § 416.920(a)(4). The following five steps are followed:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater,* 221 F.3d 126, 132 (2d Cir.2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

## C. The ALJ's Sequential Evaluation

In applying the five-step sequential analysis at the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period of her alleged onset date of June 26, 2008, through her date last insured on December 31, 2010. (Dkt. 1 at 8). The ALJ gave Plaintiff the "benefit of the doubt" in making this finding, as there was a discrepancy in the record as to whether Plaintiff had reported income for a portion of the relevant time period. (*Id.*).

At the second step, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the cervical, thoracic, and lumbar spines; intermittent pain in the upper right extremity; adjustment disorder with depression; and a history of substance abuse. (*Id.* at 9). The ALJ also noted that the medical evidence in the record showed that Plaintiff had been "medically managed" for urinary incontinence, "possible carpal tunnel" in the right hand, memory loss/"brain disorder," and sleep apnea, but found that there was not enough documentation to show that those conditions rose to the level

of a severe impairment. (*Id.* at 10). The ALJ also noted that Plaintiff claimed to have a blood disorder, and that evidence in the record suggested Plaintiff had "multiple trigger points which may suggest fibromyalgia." (*Id.*). After reviewing the record absent any medical signs or laboratory findings to support objective abnormalities, the ALJ determined that there were no medical signs or laboratory findings to support the existence of a medically determinable impairment of fibromyalgia or blood disorder. (*Id.* at 10–11).

At the third step, the ALJ analyzed the medical evidence and found that Plaintiff did not have a listed impairment or combination of impairments that would render her disabled. (*Id.* at 11–13). Specifically, the ALJ considered listings 1.02B, 1.04, 12.04, and 12.09. (*Id.*). The ALJ found that Plaintiff's alleged right arm pain did not satisfy listing 1.02B because the evidence in the record demonstrated that Plaintiff had intact hand and finger dexterity with full bilateral grip strength. (*Id.* at 11). The ALJ further determined that Plaintiff's degenerative disc disease did not satisfy listing 1.04 because there was no evidence of nerve root compression, spinal arachnoiditis, lumbar spinal stenosis, or compromised nerve root. (*Id.* at 11–12). The ALJ then walked through the psychiatric review technique and concluded that Plaintiff's mental impairments did not satisfy listings 12.04 or 12.09. (*Id.* at 12–13).

At the fourth step, the ALJ determined Plaintiff's residual functional capacity to perform work. (*Id.* at 13–17). The ALJ concluded that Plaintiff had the following RFC:

> [t]o perform less than the full range of light work as defined in 20 CFR 404.1567(b), in that the claimant was able to lift and/or carry twenty pounds occasionally and ten pounds frequently, walk and/or stand for about six hours in

an eight-hour workday, and sit for about six hours in an eight-hour workday. The claimant was able to occasionally engage in postural activities, but needed to avoid repetitive overhead lifting with her upper right extremity. Furthermore, the claimant retained the ability to understand, carry out, and remember simple instructions and directions, respond appropriately to supervision, coworkers, and usual work situations, and deal with changes in a routine work setting.

(*Id.* at 13).

Considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ found that Plaintiff could not perform her past relevant work as a school bus driver or construction worker, but found that Plaintiff was not disabled by applying the framework of Medical–Vocational Rule 202.21. (*Id.* at 18–19). The ALJ noted that "[e]ven if [Plaintiff] were limited to sedentary exertion, a finding of 'not disabled' would still be appropriate under the grid rules." (*Id.* at 19).

Plaintiff claims that the ALJ misstated the applicable legal standards for considering a fibromyalgia diagnosis; improperly disregarded the diagnoses of her treating physician Dr. Koh and rheumatologist Dr. Clowes; and "fail[ed] to consider the limiting effects of fibromyalgia." (*Id.* at 3).

### 1. Step Two: Medically Determinable Impairment

Plaintiff first argues that the ALJ erred in finding that her fibromyalgia was not a medically determinable impairment at step two of the sequential analysis. (Dkt. 14–1 at 11).

██ "An impairment is 'severe' if it 'significantly limits [the claimant's] physical or mental ability to do basic work activities.'" *Eralte v. Colvin*, No. 14 Civ.

1745(JCF), 2014 WL 7330441, at *10 (S.D.N.Y. Dec. 23, 2014) (quoting 20 C.F.R. § 404.1520(c)). "When the parties disagree over the effect of the ALJ's failure to include a condition at step two, resolution of this issue comes down to a question of whether there was substantial evidence to support the ALJ's conclusion that [the omitted condition] should not be included as a severe impairment." *Id.* (quotations omitted) (alteration in original). "[T]he severity prong is intended as a *de minimis* standard to screen out only those claimants with 'slight' limitations that 'do not significantly limit any basic work activity.'" *Vicari v. Astrue,* No. 1:05–cv–4967–ENV–VVP, 2009 WL 331242, at *3 (E.D.N.Y. Feb. 10, 2009) (quoting *Bowen v. Yuckert,* 482 U.S. 137, 158, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)).

Here, ALJ Helens considered the medical record and concluded that there were "no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment regarding fibromyalgia...." (Dkt. 1 at 10). ALJ Tielens misconstrued the applicable legal standard in making these findings. As Plaintiff notes in her memorandum, the ALJ erroneously focused on the lack of objective findings in determining that Plaintiff's fibromyalgia was not a medically determinable impairment. (Dkt. 14–1 at 11–13).

"[A] growing number of courts, including our own, have recognized that fibromyalgia is a disabling impairment and that 'there are no objective tests which can conclusively confirm the disease.'" *Green–Younger v. Barnhart,* 335 F.3d 99, 108 (2d Cir.2003) (quoting *Preston v. Sec. of Health & Human Servs.,* 854 F.2d 815, 818 (6th Cir.1988)) (citation omitted). "[Fibromyalgia's] cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia.'" *Cabibi v. Colvin,* 50 F.Supp.3d 213, 233, 2014 WL 4269061, at *18 (E.D.N.Y.2014) (alteration in original) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996)).

"'In stark contrast to the unremitting pain of which [fibromyalgia] patients complain, physical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions.'" *Lisa v. Sec. of Dep't of Health & Human Servs.,* 940 F.2d 40, 44 (2d Cir. 1991) (quoting *Preston v. Sec'y of Health & Human Servs.,* 854 F.2d 815, 817–18 (6th Cir.1988)). "The only symptom that discriminates between [fibromyalgia] and other diseases of rheumatic character—[is] multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch." *Sarchet,* 78 F.3d at 307.

Social Security Ruling ("SSR") 12–2p sets forth the following requirements for finding that fibromyalgia is a medically determinable impairment: (1) a physician has diagnosed fibromyalgia; (2) the physician has provided evidence described either by the 1990 American College of Rheumatology (ACR) criteria or the 2010 ACR Preliminary Diagnostic Criteria; and (3) the physician's "diagnosis is not inconsistent with other evidence in the person's case record." SSR 12–2p, 2012 WL 3104869, at *2 (July 25, 2012).

Here, two physicians diagnosed Plaintiff with fibromyalgia, utilizing the recognized test of identifying "trigger points," and these diagnoses are consistent with the other evidence in Plaintiff's medical record.

The ALJ stated that the record did not "identify any of the requisite minimum eleven trigger points" (Dkt. 1 at 11), but Plaintiff's neurologist Dr. Koh noted on more than one occasion that Plaintiff demonstrated "multiple trigger points in more than 11 out of 18 points" (Tr. 455, 494). Dr. Koh further noted that Plaintiff "most likely" had fibromyalgia syndrome as a result of noted trigger points. (Tr. 495). Perhaps more telling, rheumatologist Dr. Clowes noted "diffuse tenderness all over with multiple tender spots" and assessed fibromyalgia. (Tr. 520–21). Further, Plaintiff's treatment notes from the relevant period document that she was experiencing many of the typical symptoms of fibromyalgia, although fibromyalgia had not yet been diagnosed. Nearly every treatment note in the record indicates that Plaintiff was complaining of pain in her back and legs. (*See e.g.,* Tr. 235, 291, 225, 258, 282, 286, 327, 389, 397, 405, 471, 495, 518). The medical record also shows complaints of upper body/neck pain and fatigue. (Tr. 327, 444, 486, 490, 455, 498, 518). Dr. Koh ordered a battery of tests to rule out causes for Plaintiff's fatigue and disturbed sleep. (Tr. 448, 451, 449). "[C]omplaints of pain in her back, legs, and upper body, fatigue, and disturbed sleep are internally consistent and consistent with common symptoms of fibromyalgia." *Green–Younger*, 335 F.3d at 108.

Not only did the ALJ improperly state that the medical record did not identify the requisite trigger points, but the ALJ also improperly relied on the absence of objective findings to determine that Plaintiff's fibromyalgia was not a medically determinable impairment. These errors require remand.

 The Commissioner argues that any error in identifying Plaintiff's fibromyalgia as a severe impairment was harmless because the ALJ found in Plaintiff's

favor at step two and continued through the remainder of the sequential analysis. (Dkt. 17–1 at 12–13). Where an ALJ fails to include a condition as a severe impairment, such failure is harmless if the ALJ proceeded through the sequential analysis taking the plaintiff's complaints of pain into account when making his RFC determination. *Snyder v. Colvin*, No. 5:13–cv–585(GLS/ESH), 2014 WL 3107962, at *5 (N.D.N.Y. July 8, 2014) ("[W]hen an administrative law judge identifies *some* severe impairments at Step 2, and then proceeds through sequential evaluation on the basis of combined effects of all impairments, including those erroneously found to be non severe, an error in failing to identify *all* severe impairments at Step 2 is harmless.") (emphasis in original). "[W]hen functional effects of impairments erroneously determined to be non-severe at Step 2 are, nonetheless, fully considered and factored into subsequent residual functional capacity assessments, a reviewing court can confidently conclude that the same result would have been reached absent the error." *Id.*

Here, ALJ Tielens did not consider the potential functional limitations as a result of Plaintiff's fibromyalgia symptoms after discounting Plaintiff's fibromyalgia as a medically determinable impairment, and accordingly, remand is warranted.

### 2. Treating Physician Rule

 ALJ Tielens also erred in assigning Dr. Koh's opinion "no weight." (Dkt. 1 at 17). The record indicates that Dr. Koh, Plaintiff's treating neurologist, diagnosed Plaintiff with fibromyalgia. (Tr. 455, 494). "The opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir.2013). "In order to override

the opinion of the treating physician, ... the ALJ must explicitly consider, *inter alia:* (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Id.*

Here, the ALJ assigned "no weight" to Dr. Koh's physical and mental assessments of Plaintiff, finding that the medical record did not support Dr. Koh's conclusion that Plaintiff could not push or pull weight heavier than two pounds. (Dkt. 1 at 17). The ALJ found that Dr. Koh did not provide a complete, detailed assessment of Plaintiff's physical capabilities and was afforded less weight because his opinion was based on Plaintiff's reported pain. (*Id.*). Further, the ALJ found that Dr. Koh's opinion was contradicted by Dr. Clowes' note that Plaintiff had a full range of motion of her shoulder and that Plaintiff's restriction of the cervical spine improved with distraction. (*Id.*). However, the ALJ did not discuss Dr. Koh's treating relationship with Plaintiff, his specialist status, or the medical evidence supporting Dr. Koh's opinion.

■ It would seem that Dr. Koh's opinion is entitled to at least some weight, given his extensive treatment history with Plaintiff and the fact that he had personally examined Plaintiff on several occasions. (Tr. 444, 455, 489, 490, 493, 498). In addition, the medical evidence largely supports Dr. Koh's finding that Plaintiff may have fibromyalgia. As previously noted, the medical record is replete with references to Plaintiff's pain, fatigue, and sleep difficulties. The ALJ discounts these findings and concludes that Dr. Koh's opinion is entitled to less weight in part because the opinion is largely based on Plaintiff's reports of pain. (Dkt. 1 at 17). What the ALJ fails to appreciate is that a fibromyal-

gia diagnosis is largely based on the patient's subjective reports of pain. To the extent that the ALJ discredited Dr. Koh's opinion because Dr. Clowes found that Plaintiff had a full range of motion in her shoulder, that too represents the ALJ's failure to appreciate the nature of a diagnosis of fibromyalgia. *Lisa*, 940 F.2d at 44.

■ The ALJ also discredited the opinion of consultative examiner Dr. Datta, assigning Dr. Datta "very little weight." (Dkt. 1 at 17). Plaintiff argues that the ALJ improperly discounted Dr. Datta's opinion because the ALJ misread Dr. Datta's opinion as referring only to Plaintiff's right arm pain, which was later reportedly resolved. (Dkt. 14–1 at 23). Indeed, the ALJ misinterpreted Dr. Datta's opinion. Dr. Datta opined that Plaintiff had "major limitations in all physical activities because of *above problems.*" (Tr. 330) (emphasis added). Dr. Datta had discussed not only Plaintiff's complaints of right arm pain, but also Plaintiff's low back pain secondary to degenerative disc disease. (*Id.*).

■ The ALJ further assigned "no weight" to the residual functional capacity assessment completed by the State Agency analyst. (Dkt. 1 at 17). As a result, the ALJ did not assign significant or substantial weight with respect to Plaintiff's physical limitations to the opinion of any physician in the medical record. Instead, it seems the ALJ improperly formulated his own medical opinions of Plaintiff's physical limitations. "Neither a reviewing judge nor the Commissioner is 'permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion.'" *Burgess v. Astrue*, 537 F.3d 117, 131 (2d Cir.2008) (quoting *Shaw*, 221 F.3d at 134); *see also Rivera v. Bowen*, 664 F.Supp. 708, 712 (S.D.N.Y.1987) ("A treating physician's opinion is presumptively the product of medical expertise and

personal familiarity with the claimant over an extended period of time. Administrative fact-finders, and for that matter district judges, cannot claim such insight.").

On remand, the Commissioner is directed to determine the proper weight to assign to Dr. Koh and Dr. Datta's opinions. "To the extent the record is unclear, the Commissioner has an affirmative duty 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420 (quoting *Burgess*, 537 F.3d at 129).

### 3. Additional Limitations

Plaintiff claims that the ALJ failed to consider the full extent of her additional limitations of degenerative disc disease and mental impairments. (Dkt. 14–1 at 23–25). In considering these impairments, the ALJ noted that objective medical tests showed that Plaintiff's spinal impairments were "mild" or "slight," and that more than one physician concluded that Plaintiff was capable of performing complex tasks independently. (Dkt. 1 at 9, 14). The ALJ did not commit a legal error in weighing this medical evidence, and the Court finds no reason to disturb the ALJ's findings with respect to these impairments. *See Garcia v. Comm'r of Soc. Sec.*, No. 05 Civ. 00083(RJS), 2010 WL 907662, at *6 (S.D.N.Y. Mar. 8, 2010) ("To the extent that there are inconsistencies in the evidence, it is the role of the ALJ, and not the Court, to 'weigh the conflicting evidence in the record.'") (quoting *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.1998)).

### 4. Step Five Determination

Finally, Plaintiff argues that the case involves substantial non-exertional limitations, including pain related to Plaintiff's fibromyalgia and limitations with Plaintiff's memory and ability to concentrate, that required the ALJ to obtain testimony from a vocational expert in reaching his step five determination that Plaintiff was not disabled. (Dkt. 14–1 at 26–27).

"At step five, the Commissioner is required to consult a vocational expert when the claimant possesses non-exertional impairments that significantly limit the range of work permitted by his exertional limitations." *Eralte*, 2014 WL 7330441, at *14 (quotations omitted). "Thus, the 'mere existence' of a non-exertional impairment will not automatically require the testimony of a vocational expert; instead, the non-exertional limitation must cause an 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'" *Id.* (quoting *Bapp v. Bowen*, 802 F.2d 601, 605–06 (2d Cir.1986)).

Within his decision, ALJ Tielens acknowledged that he had found non-exertional impairments, but stated that the mere existence of these impairments did not automatically require production of a vocational expert or preclude the ALJ from relying on the medical vocational guidelines to reach a determination. (Dkt. 1 at 19). In finding that Plaintiff's non-exertional impairments did not significantly diminish her ability to perform the full range of employment indicated by the medical vocational guidelines, the ALJ concluded that additional testimony or evidence was not needed to make a disability determination. (*Id.*).

Based on the ALJ's findings with respect to Plaintiff's mental limitations, the ALJ did not err in relying on the medical vocational guidelines to find that there were jobs in the national economy for Plaintiff to perform. However, pain is also a nonexertional impairment. *See Rosa v.*

*Callahan,* 168 F.3d 72, 78 n. 2 (2d Cir. 1999) ("A nonexertional limitation is one imposed by the claimant's impairments that affect her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments and pain."). If the ALJ finds on remand that Plaintiff's fibromyalgia is a medically determinable impairment that impacts Plaintiff's RFC, then the pain associated with Plaintiff's fibromyalgia would be a nonexertional impairment with the potential to have more than a negligible impact on Plaintiff's ability to work. In that case, the ALJ could not rely solely on the medical vocational guidelines to make a step five determination with respect to Plaintiff's case.

## IV. CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Dkt. 17) is denied, Plaintiff's motion for judgment on the pleadings (Dkt. 14) is granted in part, and this matter is remanded for further administrative proceedings consistent with this Decision and Order.

SO ORDERED.